**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CRAWFORD SUPPLY GROUP, INC.; FEIGER FAMILY PROPERTIES, LLC; JAMES MAINZER, as co-trustee of the Feiger Irrevocable Charitable Lead Trust and the Steven Feiger Children's Trust, and as trustee of the Siegfried-Steven 1983 Trust, the Siegfried-Steven 1985 Trust, the Judith Feiger Trust, the Siegfried-Judith 1983 Trust, the Siegfried-Judith 1985 Trust, the Steven-Jordyn Feiger 1988 Trust, and the Steven-Zachary Feiger 1988 Trust; the FEIGER FAMILY INVESTMENT PARTNERSHIP; SIG FEIGER, as the executor of the Estate of Miriam Feiger and as co-trustee of the Feiger Irrevocable Charitable Lead Trust; and JUDITH FEIGER, individually and as cotrustee of the Steven Feiger Children's Trust,  Plaintiffs,  v.  BANK OF AMERICA, N.A.,  Defendant. | No. 09 C 2513  Judge Rebecca R. Pallmeyer |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs, a number of companies and trusts controlled by the Feiger family, seek recovery of nearly $3.5 million embezzled from them by their accountant Robert Rome. Rome embezzled funds by drawing checks from Plaintiffs' accounts payable to himself as Plaintiffs' trustee or executor and depositing them in his personal or business accounts. In this lawsuit, Plaintiffs allege that Bank of America ("Defendant" or "the bank") either actually knew of Rome's breach of fiduciary duty to them, or acted in bad faith in ignoring the signs of his breach. According to Plaintiffs, Defendant knew or should have known of this embezzlement by virtue of its relationship with Rome, which included offering Rome favorable treatment for personal and business loans as well as receiving business referrals and advice from Rome. The court dismissed Plaintiffs' original complaint, concluding that they did not adequately plead that Defendant had actual knowledge of

Rome's breach or acted in bad faith in ignoring the breach. *Crawford Supply Group, Inc. v. LaSalle Bank, N.A.*, No. 09 C 2513, 2010 WL 320299 (N.D. Ill. Jan. 21, 2010). Plaintiffs have since amended their complaint, and charge Defendant with violation of UCC § 4-401; conversion; violation of the Illinois Fiduciary Obligations Act ("FOA"), 760 ILCS 65/1, *et seq.*; negligence amounting to bad faith; breach of contract; and aiding and abetting Rome's breach of fiduciary duty. Defendant argues it is shielded from liability for Rome's misconduct by the Illinois Fiduciary Obligations Act. Defendant also argues that it has not violated § 4-401 because the checks at issue were not forged or unauthorized; that there has been no conversion because Plaintiffs are not payees of the checks, or that those claims are barred by the statute of limitations; that Plaintiffs' common law claims are preempted by the UCC; that certain claims for paying checks deposited elsewhere are barred by the ratification doctrine; and that the Fiduciary Obligations Act does not provide a cause of action.

## BACKGROUND

This action is brought on behalf of a number of trusts and companies controlled or established by the Feiger family. Plaintiff Crawford Supply Group is a Delaware corporation with its principal place of business in Illinois. (Compl. ¶ 3.) Plaintiff James Mainzer, an Illinois citizen, is co-trustee of the Feiger Irrevocable Charitable Lead Trust and the Steven Feiger Children's Trust, and trustee of the Siegfried-Steven 1983 Trust, the Siegfried-Steven 1985 Trust, the Judith Feiger Trust, the Siegfried-Judith 1983 Trust, the Siegfried-Judith 1985 Trust, the Steven-Jordyn Feiger 1988 Trust, and the Steven-Zachary Feiger 1988 Trust. (*Id.* ¶ 4.) Plaintiff Sig Feiger, an Illinois citizen, is executor of the Estate of Miriam Feiger and co-trustee of the Lead Trust and Children's Trust. (*Id.* ¶ 5.) Plaintiff Judith Feiger is a California resident and co-trustee of the Children's Trust. (*Id.* ¶ 6.) Plaintiff Feiger Family Properties, LLC, is a Delaware company with its principal place of business in Illinois, whose members are Michigan and Illinois entities. (*Id.* ¶ 7.) Plaintiff Feiger Family Investment Partnership is a general partnership organized under Illinois law. (*Id.* ¶ 8.)

Defendant Bank of America, N.A., is based in North Carolina, and is a Defendant in this action by virtue of its merger with LaSalle Bank, N.A. (*Id.* ¶ 10.) Rome is not a party to this lawsuit.

Plaintiffs' allegations involve multiple accounts held by the various trusts and companies at two different banks and accounts belonging to Robert Rome and his business, Rome Associates LLP, at several different banks. Plaintiffs divide the checks at issue into three separate categories: checks drawn on accounts at Defendant's bank (Compl., Ex. A), checks deposited into accounts at Defendant's bank (Compl., Ex. B), and checks with unknown deposit information. (Compl., Ex. C.) Overlap exists between these categories; for example, a check drawn on an account at Defendant's bank and deposited into Defendant's bank would appear on both lists. The attached exhibits do not specify precisely into which accounts each check was deposited. The Estate, Partnership, Children's Trust, Lead Trust, Crawford Supply Group, and Feiger Family Properties all held checking accounts at Defendant's bank. (Second Am. Compl., Cook Co., Ill., No. 09 L 4403 [hereinafter "Cook Co. Compl."] ¶ 20.)[1] The remainder of Plaintiffs' accounts were held at UMB Bank, which is not a party to this lawsuit. (*Id.* ¶ 19.)

Plaintiffs' claims stem from Defendant's accepting checks from and paying checks to Robert Rome. Rome's embezzlement scheme was not complex. Rome, a certified public accountant, served as an accountant, executor, fiduciary, and trustee for Plaintiffs, and in those capacities Plaintiffs authorized Rome to draw checks from their accounts and endorse checks for deposit. (*Id.* ¶¶ 18, 86.) Plaintiffs allege that Rome drew checks from their accounts, mostly payable to

---

[1] Defendant includes the Cook County Complaint as Exhibit A to its Reply Brief. (Dkt. 109.) The court may take judicial notice of a matter of public record without converting this motion to dismiss into a motion for summary judgment. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997). The Cook County lawsuit seeks recovery from Harris Bank for Rome's fiduciary breach under essentially the same theories as the instant action. (Cook Co. Compl. ¶¶ 1-3.) The same Plaintiffs bringing this action allege in the Cook County lawsuit that Harris "improper[ly] accept[ed] [ ] deposits into Rome's thirteen personal and business accounts at Harris of nearly $7 million in checks and wire transfers." (*Id.* ¶ 13.) Defendant in this action removed to federal court pursuant to diversity jurisdiction; Harris, based in Chicago, Illinois, is not diverse in citizenship from Plaintiffs.

himself as a trustee or executor–as he was authorized to do–but deposited them into his personal and business accounts.

Plaintiffs allege that Rome had a significant and ongoing financial relationship with Defendant, including serving as an advisor to Defendant between 1998 and 2003, which gave Defendant special insight into Rome's finances. (*Id.* ¶ 22.) Rome referred numerous clients, including Plaintiffs, to Defendant. (*Id.* ¶ 20.) Rome also had a personal and/or business relationship with Norm Bobins, who served as President and CEO of LaSalle Bank, which has since merged with Defendant. (*Id.* ¶ 23.) Plaintiffs allege that from 2003 to 2005, Rome used embezzled funds to pay off his personal and business debts to Defendant. (*Id.* ¶¶ 56-60, 62-72.) Specifically, Defendant made a personal home mortgage loan to Rome in 1996 for $1 million, which was increased to $1.7 million in 2000, and to $2.475 million in 2004. (*Id.* ¶ 25.) Defendant made numerous car loans to Rome, totaling more than $70,000 in 2002. (*Id.* ¶ 26.) Defendant extended multiple lines of credit to Rome and his businesses, as well, including a personal line of credit for $194,537 in 2000 and more than $1.5 million in business loans. (*Id.* ¶¶ 27-30.) Plaintiffs allege that Defendant extended these loans and lines of credit without loan applications or sworn personal financial statements, and after Rome had defaulted on loan covenants. (*Id.* ¶¶ 31-35.) Further, Plaintiffs allege, Rome's personal tax returns demonstrated he did not have enough income to support his liabilities; in 2004, for example, he reported income of $160,413, but his interest and tax obligations exceeded $169,000. (*Id.* ¶¶ 36-38.)[2]

Plaintiffs also allege that Defendant began investigating Rome in 2002 or 2003 in connection with a fraud scheme. (*Id.* ¶ 46.) In February 2004, Defendant contacted an attorney to gather information about the amount of Rome's malpractice insurance. (*Id.* ¶ 47.) In February

---

[2]     Many of the checks embezzled by Rome and used to pay off his personal obligations to Defendant were first deposited at Harris Bank and other banks, (*id.* ¶¶ 70-72, 89), which, Defendant urges, undermines any claim that it knew of Rome's fiduciary breach.

4

2005, Defendant sued Rome, his business, and a client of Rome's, Northwestern Golf, for fraud, breach of fiduciary duty, negligence, and negligent misrepresentation, in connection with a scheme to obtain loans based on fraudulent documents, causing $15 million in losses. (*Id.* ¶¶ 48-50.)

In total, Plaintiffs allege that Defendant improperly paid $2.9 million to Rome from Plaintffs' bank accounts at Defendant's bank between 2003 and 2007. (*Id.* ¶ 82.) Defendant paid an additional $421,513 from Plaintffs' accounts into Rome's own accounts at Defendant's bank during that same time period, and paid an additional $113,000 of Plaintiffs' funds either into Rome's accounts at Defendant's bank or other banks. (*Id.* ¶ 83-84.) Defendant allegedly paid numerous checks endorsed by "Robert Rome, Trustee" or "Robert Rome, Executor" but deposited in Rome's personal or business accounts at Defendant's bank or Harris Bank. (*Id.* ¶ 90.) Defendant also permitted Rome to open a joint account in Judith Feiger's name without her authorization, from which more than 20 checks were written and deposited in Rome's personal accounts. (*Id.* ¶¶ 75-81, 90.) Plaintffs allege 69 fraudulent transfers for $10,000 or more, and 15 for $50,000 or more. (*Id.* ¶ 110.) Specifically, for example, Plaintiffs note that on October 14, 2004, Rome drew a check for $215,000 from one of Plaintiffs' accounts to "Robert Rome, Executor"; endorsed the check, "Robert Rome"; and deposited it into his personal account at Harris. (*Id.* ¶¶ 104-05.) On May 1, 2006, Rome deposited a check payable to "Robert Rome, Trustee Judith Feiger Account" into his personal account at Harris Bank. (*Id.* ¶¶ 106-09.) On February 5, 2007, Rome deposited a check payable to "Trustee of Mimi Feiger Trust" for $184,380 into his personal account at Harris Bank. (*Id.*) Three checks drawn on Plaintiffs' accounts worth $15,000 were deposited into Rome's personal account at Defendant's bank without any endorsement at all. (*Id.* ¶¶ 111-13.) .

Plaintiffs allege that Defendant violated Section 4-401 of the Illinois Uniform Commercial Code, by paying checks that were not properly payable (Count I); converted at least $421,513 in connection with Rome's deposit of unauthorized checks (Count II); acted with negligence amounting to bad faith in breaching duties of reasonable care and good faith (Count III); breached

5

contracts with Plaintiffs by failing to exercise ordinary care in disbursing funds from accounts held by Plaintiffs (Count IV); violated the Illinois Fiduciary Obligations Act by depositing checks with actual knowledge that Rome was in breach of his fiduciary duties or in bad faith (Count V); and aided and abetted Rome's breach of fiduciary duty (Count VI).

The court previously dismissed Plaintiffs' complaint, concluding that Plaintiffs did not allege facts sufficient to support a conclusion that Defendant acted in bad faith or with actual knowledge of Rome's wrongdoing. *Crawford Supply Group*, 2010 WL 320299, at *6. The Illinois Fiduciary Obligations Act therefore shielded Defendant from liability. *Id.* The court rejected Plaintiffs' argument that Defendant's knowledge of Rome's fiduciary relationship with Plaintiffs, coupled with his frequent transfers of large sums between business and personal accounts, and irregular endorsements, established that Defendant should have known Rome was defrauding Plaintiffs. *Id.* "What [Defendant] 'should have known' is not what matters. . . . What matters under the Fiduciary Obligations Act is what [Defendant] actually knew." *Id.* at *7. Frequent transfers of money by a fiduciary into a personal account, even accompanied by irregularities or suspicious circumstances, the court concluded, does not support an inference of actual knowledge or bad faith. *Id.* at *7-9.

The court then addressed whether Plaintiffs had alleged facts supporting an inference that Defendant suspected Rome of impropriety or "fiduciary breaches [that] were so obvious that [in similar cases] a bank was ultimately found to have acted in bad faith by not investigating." *Id.* at *8. The court found Plaintiffs had not done so:

> Plaintiffs do not allege that [Defendant] accepted payments from Rome to service Rome's personal debt. They do not allege that [Defendant] had any special insight into Rome's income or personal finances. They do not allege that any employee of [Defendant] had a relationship with Rome. They do not allege that [Defendant] gave Rome preferential treatment or assistance. They do not allege that [Defendant] derived any benefit as a result of Rome's behavior. The transactions that Plaintiffs do describe were not *per se* alarming such that [Defendant's] duty to investigate was triggered, and Plaintiffs make no attempt to allege that [Defendant] was somehow willfully blind to Rome's wrongdoing.

*Id.* at *9.

Plaintiffs filed an amended complaint that attempts to remedy the shortcomings identified by the court.

**DISCUSSION**

The court will grant a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Although all that is required of a plaintiff is "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a), the complaint's factual allegations must be sufficient "to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plausibility requires more than facts "consistent with a defendant's liability." *Id.* "[T]he well-pleaded facts . . . [must] permit the court to infer more than the mere possibility of misconduct." *Id.* In evaluating a motion to dismiss, the court accepts plaintiff's well-pleaded factual allegations as true, and draws reasonable inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court need not accept as true, however, legal conclusions, even if they are couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949-50.

## I.     Fiduciary Obligations Act

In passing the Fiduciary Obligations Act, "the Illinois General Assembly expressed the intent to preempt other state law and to establish a total defense to banks for all claims arising from a bank's honest interactions with fiduciaries." *Crawford Supply Group*, 2010 WL 320399, at *9. Count V of Plaintiffs' complaint is brought pursuant to the Act. Defendant argues that the Fiduciary Obligations Act does not itself create a cause of action, and instead bars Plaintiffs' claim for relief here. The court first addresses the argument that the FOA bars any claim for relief against Defendant.

7

**A.** **Plaintiffs' Claims Are Not Barred By the Illinois Fiduciary Obligations Act**

The Illinois Fiduciary Obligations Act shields a bank from liability for the misappropriation of funds if the bank pays or transfers money to a fiduciary in "good faith," 760 ILCS 65/2, "unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." 760 ILCS 65/9. Merely invoking the terms "actual knowledge" and "bad faith" is not sufficient to survive dismissal, however. *Falk v. Northern Trust Co.*, 327 Ill. App. 3d 101, 110, 763 N.E.2d 380, 387 (1st Dist. 2001) (citation omitted).[3] "The Fiduciary Obligations Act was meant to shift the burden of employing honest fiduciaries to the principal instead of the banking institution." *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 769, 863 N.E.2d 1156, 1165 (2d Dist. 2007). The Act does not define "bad faith" but does explain that a "thing is done 'in good faith' within the meaning of this Act, when it is in fact done honestly, whether it be done negligently or not." 760 ILCS 65/1(2). Bad faith exists "where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating," *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 50, 832 N.E.2d 376, 386 (1st Dist. 2005) (citation and quotation omitted), or where the bank acts in a "commercially unjustifiable" manner in refusing to learn "readily available facts." *Appley*, 832 F.3d at 1031 (citation and quotation omitted).

In dismissing Plaintiffs' original complaint, the court concluded that it did not allege actual knowledge of the fraud on Defendant's part. Specifically, the court noted that Plaintiffs alleged

---

[3]     *Appley v. West*, 832 F.2d 1021 (7th Cir. 1987) did suggest an allegation of bad faith or actual knowledge without much more would be enough to survive a motion to dismiss. *Id.* at 1031 ("Because Ms. Appley has alleged bad faith and actual knowledge in her complaint, there is a legal theory on which she possibly can recover. She should be given the opportunity to proceed with discovery and to test her evidence before the trier of fact."). As this court observed earlier, however, *Appley* predated *Twombly* and *Iqbal*, which clarified that a "formulaic recitation" of the law is not enough to survive a motion to dismiss. *Crawford Supply Group*, 2010 WL 320299, at *8 n.3.

(1) LaSalle knew Rome was Plaintiffs' fiduciary; (2) Rome frequently moved large sums of money into his personal and business accounts at LaSalle from Plaintiffs' fiduciary accounts; and (3) when endorsing checks, Rome typically signed as "Robert Rome-Executor" or "Robert Rome-Trustee," but occasionally signed only his own name.

*Crawford Supply Group*, 2010 WL 320299, at *6. The court also examined the allegations that Rome opened an account in Judith Feiger's name in violation of Defendant's policies, and did so without actual or apparent authority. The court concluded that "[t]he fact that Rome presented LaSalle with forged and misleading documents when he opened the joint account does not give rise to an inference that LaSalle acted with actual knowledge or bad faith with regard to Plaintiffs' other claims." 2010 WL 320299, at *9. The court invited Plaintiffs to "disentangle" Judith Feiger's claims because they were "potentially viable." *Id.* (*Compare, e.g.,* Compl. [1] ¶¶ 25-32 & Count III with Compl. [90] ¶¶ 75-81 & Count III.)

Plaintiffs have not yet accepted the court's invitation, and for purposes of the renewed motion to dismiss, the court sets aside those portions of Plaintiffs' complaint that are unchanged from the prior complaint. For the same reasons explained earlier, the court concludes that neither Defendant's knowledge of Rome's fiduciary relationship to Plaintiffs, nor the frequent movement of large sums of money between accounts, nor irregularities in endorsements, nor the creation of the Judith Feiger account, support an inference of bad faith or actual knowledge sufficient for Plaintiffs to clear the bar imposed by the Illinois Fiduciary Obligations Act.

Plaintiffs have, however, alleged additional facts in their amended complaint that they believe will overcome the FOA hurdle: Plaintiffs now allege that Defendant had special insight into Rome's personal financial circumstances by virtue of the personal obligations he owed to Defendant, and that Defendant benefitted from its ongoing relationship with Rome, choosing to ignore his breaches rather than lose his business. For reasons explained here, the court concludes Plaintiffs' Amended Complaint is sufficient, if barely so, to overcome the FOA defense. The court stands by its determination that Rome's personal accounts and pattern of activity is not enough,

by itself, to support a finding of bad faith on the part of the bank. The bank's investigation of Rome's activities concerning Northwestern Golf is more troublesome, however, and Plaintiffs' allegations about that matter are sufficient to state a plausible claim.

### 1.    Rome's Pattern of Activity

Plaintiffs have suggested that Rome's pattern of banking activity put Defendant on notice of his wrongdoing. In support, Plaintiffs point to several lines of credit Rome held from Defendant's bank, obligations that Plaintiffs allege he paid off with embezzled funds. Plaintiffs cite *Falk*, in which a bookkeeper embezzled $2 million from her employer over a four-year period. In that case, the bookkeeper transferred funds from the principal into her own account and used the principal's account to pay off personal obligations to the bank that the bank knew she could not afford. 327 Ill. App. 3d at 103-04, 763 N.E.2d at 382. The court concluded that plaintiff's allegations survived a motion to dismiss because the bank had "reviewed her tax returns and other personal information . . . [and] was aware that her income was insufficient to support the account and loan activity she was generating." *Id.* at 104, 763 N.E.2d at 382.

Similarly, Plaintiffs note, in *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292 (N.D. Ill. Sept. 5, 1996), the court rejected Bank One's motion to dismiss based on the Fiduciary Obligations Act. *Id.* at *4. In that case, David Reinert, the elected supervisor of Elgin Township, allegedly stole $1.7 million from the township and stashed it in various personal accounts at Bank One. *Id.* at *1. Plaintiff alleged that Reinert received favored treatment from the bank, including a nearly 100 percent loan-to-value ratio loan, and relaxation of loan standards in exchange for business. *Id.* at *1 n. 1. Reinert allegedly opened a secret township account into which he deposited township funds before transferring them to his personal account and then used them to pay off his personal obligations. To conceal this fraud, Reinert would kite checks between two different banks so that bank statements conformed to the township auditor's expectations. *Id.* at *2. Plaintiff further alleged that when a third bank caught Reinert kiting checks, Bank One

instructed him to cover the kited check, but took no additional action. *Id.* at n.2. The kiting scheme was remarkably "successful"—in 1993, Reinert allegedly cleared checks for $1.6 million drawn upon less than $30,000. *Id.* at *2 n.4. The court concluded that while no one incident supported an inference of bad faith, "their totality raises enough of an inference of bad faith for pleading purposes." *Id.* at *4.

*Ohio Casualty* distinguished *Johnson v. Citizens Nat'l Bank of Decatur*, 30 Ill. App. 3d 1066, 334 N.E.2d 295 (4th Dist. 1975), where the only allegation of bad faith was that the third-party fiduciary jointly held a personal account with his wife, and that he had made one payment of a personal obligation to the bank from that account. "[M]ere suspicious circumstances are not enough to require the Bank to inquire . . . [because] there are many legitimate reasons why an agent and principal might engage in odd checking practices." *Johnson*, *id.* at 1072, 334 N.E.2d at 300. The *Ohio Casualty* court noted that the allegations against Reinert and Bank One involved "more than mere suspicious circumstances." 1996 WL 507292, at *4 n.9.

In yet another Fiduciary Obligations Act case, an attorney who acted as co-executor of an estate took checks paid out from the sale of estate assets, improperly endorsed them, and deposited them into his client escrow account, which he then used to pay off nearly $300,000 in personal obligations to the bank and for other personal expenses. *Mikrut*, 359 Ill. App. 3d at 50, 832 N.E.2d at 385. The attorney maintained three personal accounts, in addition to his escrow account, at the bank, where he also had a home mortgage. *Id.* at 43, 832 N.E.2d at 380. And he had provided legal services for three of the bank's principals. *Id.* at 43-44, 832 N.E.2d at 380-81. The *Mikrut* court nonetheless granted summary judgment for the bank, rejecting plaintiffs' argument that "because First Bank had access to all of [the fiduciary's] financial information, it could have discovered that [the fiduciary's] personal expenditures greatly exceeded his income." *Id.* at 50, 832 N.E.2d at 385.

These cases suggest that Rome's maintenance of a personal account at the bank, and the

11

personal obligations he owed to the bank, are not enough by themselves to state a claim that the bank acted with bad faith in ignoring his fiduciary breach. As in *Ohio Casualty*, there must be something more, like repeated kiting of checks, that would have alerted the bank to Rome's activities. That many of the allegedly embezzled checks first passed through accounts at another bank further undermines Plaintiffs' insistence that Defendant was on notice of Rome's misfeasance. Defendant argues it "had neither the ability nor the duty to perform [a] forensic accounting when it paid the checks" to determine the path of those funds prior to payment of Rome's obligations. (Reply at 10.) The court notes that Defendant does not address the specific obligations Rome owed to it, nor does it suggest that Rome's obligations did not outstrip his personal income. Instead, Defendant insists it could not have known the genesis of the funds Rome used to pay off his debts, nor that Rome himself lacked the funds to do so. Defendant argues any "special insight" it might have had into Rome's personal finances was irrelevant because it did not know into whose accounts checks were deposited at Harris Bank. (*Id.* at 9.) For their part, Plaintiffs offer no specific facts that could have shown the bank that Rome could not meet his personal obligations. Nor do Plaintiffs suggest Rome's liabilities were so significant that he could not have paid them off. (For example, while his home loan was increased, Plaintiffs do not address whether the value of his home also rose.)

In short, Plaintiffs' complaint still does not allege that the pattern of deposits that Rome made into his personal accounts, or the payment of his obligations to Defendant (allegedly with embezzled funds), shows that Defendant either had actual knowledge of Rome's embezzlement or acted in bad faith in disregarding suspicions of such embezzlement. That Rome had, in various accounts, money not consistent with his income also does not establish the bank's bad faith. Again, "there are many legitimate reasons why an agent and principal might engage in odd checking practices." *Johnson*, 30 Ill. App. 3d at 1072, 334 N.E.2d at 300. Nor are the allegations related to the personal obligations Rome owed to and paid to Defendant sufficient to show that

Defendant acted with bad faith or actual knowledge of a fiduciary breach. And, as *Mikrut* shows, 359 Ill. App. 3d at 43-44, 832 N.E.2d at 380-81, Rome's unspecified "personal and/or business relationship" with one of Defendant's principals does not require a finding of bad faith on the part of the bank. If banks were charged with cross-referencing the accounts of all those who had dealings with the bank and acted as fiduciaries with their personal incomes and other assets, banking by fiduciaries would be perilously complicated. Imposing such a duty would be plainly inconsistent with the intent of the Fiduciary Obligations Act.

### 2.     Investigation of Rome's Involvement with Northwestern Golf

Plaintiffs also argue that Rome's breach of his fiduciary duty to another client alerted or should have alerted Defendant of his breach to Plaintiffs, and that Defendant deliberately refrained from investigating Rome's fiduciary breach to Plaintiffs because of the business relationship he had with Defendant. This argument may have greater traction. According to Plaintiffs, in 2002 or early 2003, Defendant began investigating Rome's scheme to defraud the bank in connection with another of Rome's clients, Northwestern Golf Company, and the bank sued Rome in February 2005. (Response at 5-6.) Plaintiffs allege that "the bank [nevertheless] deliberately refrained from investigating Rome's other conduct or transactions at the bank, including Rome's embezzlement of millions of dollars from Plaintiffs' accounts." (*Id.* at 6.) Plaintiffs are correct that bad faith is shown "where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order [ ] to avoid knowledge that the fiduciary is acting improperly." *Ohio Casualty*, 1996 WL 507292, at *3 (citing *County of Macon v. Edgcomb*, 654 N.E.2d 598, 601 (4th Dist. 1995)). "In determining whether the bank acted with bad faith, courts have asked whether it was commercially unjustifiable for the payee to disregard and refuse to learn facts readily available. . . . At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive.'" *Appley*, 832 F.2d at 1031 (citation and quotation omitted).

Defendant responds that the bank's suspicions about Rome's conduct involving

Northwestern Golf "would not be grounds for [Defendant] to suspect that Rome was defrauding Feiger Family Partnership and Feiger Family Properties." (Reply at 11.) As another court noted, regarding an investigation undertaken by a bank in response to irregularities in a trading account and a letter from an individual who had transferred money into that account, "[t]hese are hardly the actions of a bank acting in 'bad faith.'" *Quilling v. Nat'l City Bank of Michigan/Illinois*, No. 99 C 50412, 2001 WL 1516732, at *9 (N.D. Ill. Nov. 27, 2001) (granting summary judgment to bank charged with bad faith in ignoring the fiduciary breach of an individual who acted as a fiduciary for a "high yield trading program" account, but used the funds held in that account for his personal benefit). *Quilling* differs, though, because Plaintiffs here allege that Defendant did not investigate Rome's activities related to their accounts at all. Defendant had an incentive to take prompt action to investigate Rome's conduct with respect to Northwestern Golf: Northwestern Golf and Rome are alleged to have participated together in a fraud that victimized the bank itself, by inflating the value of Northwestern Golf's assets in order to justify larger loans from Defendant. (Compl. ¶ 48.) The bank was not a victim of the Feiger fraud, however. To the contrary, the bank arguably realized a short-term gain from Rome's activities with respect to the Feiger entities, both from increased assets on deposit and in continued payments on Rome's obligations to the bank. Notably, the scheme Plaintiffs have alleged occurred during the same time period, from 2003 to 2005, as did the Northwestern Golf fraud, although Plaintiffs' claims also extend to checks processed as late as 2007.

Plaintiffs also allege that Defendant discovered Rome understated his personal liabilities in 2002 and 2003 by a total of nearly $90,000, and in the same internal bank correspondence where it noted these understatements, "the bank cited Rome's status as an excellent referral source and chose to overlook Rome's misrepresentations and extend him additional credit." (Response at 6.) Defendant's motion to dismiss makes no mention of these allegations.

The court concludes that Plaintiffs' allegations support an inference of bad faith on

Defendant's part. As in *Ohio Casualty*, "[w]hile probably none of the matters alleged, standing alone, would be sufficient to demonstrate bad faith, their totality raises enough of an inference of bad faith for pleading purposes." 1996 WL 507292, at *4. The court notes that the conduct alleged in *Ohio Casualty* appears far more egregious than that alleged here, in particular the allegations in that case of repeated check kiting and the bank's advice to the fiduciary on how to successfully continue his improper activities. Nonetheless, the court finds the totality of the allegations–in particular, that Defendant began investigating Rome's understatement of personal liabilities and his part in the Northwestern Golf fraud several years before Plaintiffs became aware of his embezzlement of their funds–does support an inference of bad faith sufficient for the claim to survive a motion to dismiss.

Defendant attempts to carve out a number of occurrences that it argues should not progress beyond the motion to dismiss stage. In particular, Defendant argues it cannot be liable for checks drawn on the accounts held at UMB Bank because Defendant "did not owe any duty to those non-customers." (Reply at 14.) Defendant offers no authority or other support for this argument. The FOA shields a bank that receives a deposit or pays a check to a fiduciary's personal account if not acting in bad faith or with actual knowledge of a fiduciary breach. 760 ILCS 65/9. Because Plaintiffs allege that Defendant accepted checks drawn on non-customer accounts for deposit *at its bank*, the FOA applies to those transactions, and the court's conclusion that the FOA does not require dismissal at this stage applies to those transactions as well.

**B.  Does the Fiduciary Obligations Act Create a Cause of Action?**

Defendant argues that Count V, alleging that it violated the Illinois Fiduciary Obligations Act, should be dismissed because the Act does not create a cause of action but only serves to shield Defendant from liability. (Def.'s Br. at 7.) Defendant's sole citation in support of this argument is to *Appley*, in which the court explained that "[t]he UFA did not create the cause of action [against a bank for a fiduciary's misappropriation]. Rather, the UFA is a defense to such an action unless

the bank has actual knowledge that the fiduciary is breaching his fiduciary obligations or the bank acts with bad faith." 832 F.2d at 1031.

Defendant is generally correct that the Fiduciary Obligations Act "relieves banks of liability for negligence and serves as a defense against allegations of negligence." *Time Savers*, 371 Ill. App. 3d at 768, 863 N.E.2d at 1164-65. Despite the Act's apparent purpose–to shield banks against negligence claims–Illinois courts have used language suggesting that the Act establishes an independent claim for relief. Thus, courts have explained that a plaintiff "may recover under the Fiduciary Obligations Act if he can prove (1) that the bank had actual knowledge of the fiduciary's misappropriation of the principal's funds, or (2) that the bank had knowledge of sufficient facts that its actions in paying the funds amount to bad faith." *Id.* at 768, 863 N.E.2d at 1165 (citing *Continental Cas. Co. v. American Nat'l Bank*, 329 Ill. App. 3d 686, 768 N.E.2d 352 (1st Dist. 2002) (concluding that a bank's actions were "commercially unreasonable" when it failed to examine an employee's deposit into his personal account of nine checks from his employer not payable to him, from an account for which he was not an authorized signatory)). In *Continental Casualty*, the court reversed dismissal of plaintiff's bad faith claim on motion, apparently unmoved by the bank's argument that the Act does not create an affirmative cause of action. 329 Ill. App. 3d at 702, 768 N.E.2d at 365. *See also Continental Cas. Co. v. American Nat'l Bank*, 385 Ill. App. 3d 687, 697, 896 N.E.2d 340, 348 (1st Dist. 2008) ("[a] plaintiff may recover under [Section 9 of] the Illinois Fiduciary Obligations Act"). *See also Lawyers Title Ins. Corp. v. Frontier Title Co.*, No. 87 C 10872, 1989 WL 44186, at *4 (N.D. Ill. 1989) ("Section 9 of the Act provides a cause of action against a bank . . . . ").

Although the parties have spilled ink on this issue, the court concludes it need not decide whether the FOA, though it uses the language of a defense, in fact authorizes an affirmative claim for relief. Plaintiffs in this case have alleged claims for "negligence amounting to bad faith" (Count III) and for breach of contract (Count IV). The FOA bars such claims absent a showing of

knowledge or bad faith; as previously discussed, the court concludes that Plaintiffs' allegations are sufficient at this stage to overcome the bar and permit the negligence and breach of contract claims to proceed. Whatever the scope of any independent FOA claim, Plaintiffs have not satisfied the court that it involves any elements independent from the claims set forth in Counts III or IV, or that it would afford any non-duplicative relief. For purposes of this case, the court concludes that an independent FOA claim would constitute nothing other than an allegation of bad faith negligence or breach of an implied contractual duty of ordinary care. *See Continental Casualty*, 329 Ill. App. 3d at 693, 768 N.E.2d at 358. Count V is dismissed without prejudice as duplicative of Counts III and IV.

## II.    UCC § 4-401 (Count I)

Having determined that the Fiduciary Obligations Act does not shield Defendant from liability, the court moves to Plaintiffs' remaining counts. Plaintiffs argue that Defendant's payment of checks from its accounts (which are not identified individually in the complaint), violated the Illinois Uniform Commercial Code, 810 ILCS 5/4-401, because those checks "were not properly payable, were not authorized by the respective customers, and were not in accordance with the agreements between the customers and Bank of America." (Compl. ¶ 118.) Defendant argues that Plaintiffs do not allege that either the drawer signature or payee endorsement were forged or unauthorized, which is necessary for a § 4-401 claim. (Def.'s Br. at 2.) "An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." 810 ILCS 5/4-401. "[W]hen a check is made payable to order . . . the drawer has the right to expect that the named payee has indorsed the check and . . . that the funds have been deposited only in the account of the named payee." *Nat'l Bank of Monticello v. Quinn*, 126 Ill.2d 129, 139, 533 N.E.2d 846, 851 (1988). The question in this situation is trickier: whether the Defendant can be held liable for paying "Robert Rome, Trustee" when the named payee is "Robert Rome, Executor," or in similar circumstances.

17

The Seventh Circuit has addressed a similar UCC § 4-401(a) claim where Northern Trust paid a check without an endorsement into the account of someone other than the named payee. *Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 400 (7th Cir. 2004). The court found that plaintiff could not recover more than nominal damages because, had Northern Trust returned the check to the named payee, he would have endorsed it and given it back to the individual who had deposited it, who would then have deposited it again with the proper endorsement, "and so [plaintiff] would still have lost her money." *Id.* Similarly, here, Defendant argues, had the bank returned a check to Rome because it included an improper endorsement, he would have (or, at least, could have) simply properly endorsed it and deposited it again. (Def.'s Br. at 3.) Furthermore, as the *Conder* court recognized, Defendant had no obligation to ensure that the type of endorsement matched the type of account, so a check endorsed as "Executor" or "Trustee" could have been deposited into a personal account without generating suspicion. 384 F.3d at 400 ("Tasking banks to read every check to make sure that the payee's identity was consistent with the character of the account would impose an unreasonable burden. . . . "). Plaintiffs argue that unlike in *Conder*, here Defendant would have been put on notice of a breach of fiduciary duty. (Response at 20.) Plaintiffs, however, provide no authority for such an argument. While an improper endorsement might have alerted Defendant to the breach of fiduciary duty, that would be relevant to the previous discussion of the FOA defense, not to whether the check was "properly payable."

Plaintiffs' second argument in support of their UCC claim is that the checks were not "properly payable" because payment was not made in "good faith." (Response at 20.) Plaintiffs provide no authority discussing the implications of this "good faith" argument for a claim under UCC § 4-401. Defendant notes that Rome was an authorized signatory of all Plaintiffs' accounts (save for the fraudulent Judith Feiger account), and there is no allegation that signatures on the checks Rome deposited were forged. (Reply at 2 n. 1.)

18

The claim related to Judith Feiger's account differs in that § 4-401 requires a check to be "deposited only in the account of the named payee," *Nat'l Bank of Monticello*, 126 Ill.2d at 139, 533 N.E.2d at 851, and that account allegedly did not belong to Judith Feiger. The court declines to dismiss Plaintiffs' claims as they relate to checks deposited into the Judith Feiger account, but otherwise dismisses this claim.

## III.    Conversion (Count II)

Plaintiffs next allege conversion of $421,513.28 worth of checks deposited into Rome's business and personal accounts at Defendant's bank.  Defendant argues this claim should be dismissed because Plaintiffs are not payees of the checks in question.  (Def.'s Br. at 4.)  Though Plaintiffs do not specify what provision they bring this claim under, claims for conversion of negotiable instruments in Illinois are often brought pursuant to 810 ILCS 5/3-420,[2] and Defendant responds to the claim as if brought under this provision.  (Def.'s Br. at 4.)  "In order to establish that a financial institution is liable for conversion of a negotiable instrument in Illinois, a plaintiff must prove (1) her ownership of, interest in or right to possession of the check; (2) the fact that her apparent endorsement of the check was forged or unauthorized; and (3) the fact that the defendant bank was not authorized to cash the check."  *American Nat'l Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 909 (7th Cir. 2008).

Defendant argues that Plaintiffs cannot bring a claim for conversion because the drawer of a check has no possessory interest in that check.  Comment 1 to 810 ILCS 5/3-420 clearly supports this argument:  "There is no reason why a drawer should have an action in conversion [against a depository bank].  The check represents an obligation of the drawer rather than property of the drawer."  *See also Great Lakes Higher Educ. Corp. v. Austin Bank*, 837 F.Supp. 892, 897-98 (N.D.

_____

[2]    Section 3-420, for "[c]onversion of instrument," explains that "law applicable to conversion of personal property applies to instruments," and that conversion also occurs when "a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."  810 ILCS 5/3-420(a).

Ill. 1993).

Plaintiffs do not challenge this defense. Their argument in support of conversion relies on *Travelers Cas. & Sur. Co. of America, Inc. v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499 (7th Cir. 2007), but that case makes no mention of § 3-420. Instead, it addresses UCC § 3-307, which provides that the taker of a check is liable to the drawer if the taker "knows that the instrument is signed by a fiduciary of the drawer . . . yet it is deposited in the fiduciary's personal account rather than in [the] principal's account." *Travelers Casualty*, 480 F.3d at 503. The court concludes that § 3-307 is the sole basis for Plaintiffs' conversion claim and turns to Defendant's arguments that any claim under that provision must also be dismissed.

One of those arguments rests on the three-year statute of limitations applicable to § 3-307. Rome's alleged embezzlement occurred between January 2003 and September 2007. Plaintiffs filed suit on April 13, 2009. Plaintiffs contend that, because Rome's actions constituted an ongoing scheme, the statute of limitations did not begin to run until Defendant paid or accepted the final check, on or about September 11, 2007. (Response at 24.) Such an argument rests on the "continuing violation" or "continuing transaction" rule. In support, Plaintiffs cite to *Kidney Cancer Ass'n v. North Shore Community Bank*, 373 Ill. App. 3d 396, 869 N.E.2d 186 (1st Dist. 2007), in which the court considered whether, for statute of limitations purposes, a common law conversion claim "was one continuing transaction." *Id.* at 400, 869 N.E.2d at 190. The court noted that "the validity of the continuing violation rule is dependent upon the cause of action alleged." *Id.* at 405, 869 N.E.2d at 194. Because each individual occurrence would have supported a conversion claim, the court determined, the statute of limitations for each alleged instance began running when each check was deposited. *Id.*[3] Plaintiffs also point to another case examining a common law

---

[3]    *Kidney Cancer* thus undermines Plaintiffs' argument, but Plaintiffs cite it for its discussion of the "discovery rule," not for its discussion of the "continuing violation" rule. *Kidney Cancer* acknowledged that the "discovery rule" applies where fraudulent concealment is alleged,
(continued...)

conversion claim against a bank for repeatedly accepting checks marked "for deposit only" into the account of an individual who was not the named payee. *Field v. First Nat'l Bank of Harrisburg*, 249 Ill. App. 3d 822, 619 N.E.2d 1296 (5th Dist. 1993). The court concluded that because the named payee never received any information about this third-party account, the course of conduct constituted a single transaction for statute of limitations purposes. *Id.* at 826, 619 N.E.2d at 1299.

*Field* does lend support to Plaintiffs' claim. That case, however, is no longer good law. *Kidney Cancer* explained that the Illinois Supreme Court's decision in *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A.*, 199 Ill.2d 325, 770 N.E.2d 177 (2002) clarified that the continuing violation rule applies only when "the defendant's acts are relevant to the cause of action." *Kidney Cancer*, 373 Ill. App. 3d at 405, 869 N.E.2d at 194. Because "a single unauthorized deposit . . . gave the Association the right to file a conversion action," the court concluded that the continuing violation rule did not apply. *Id.* at 405, 869 N.E.2d at 194. The Seventh Circuit has also rejected *Field*'s

---

[3](...continued)
but rejected its application in that case because, while plaintiff alleged diversion of $330,000 worth of checks over a five-year period, plaintiff did not allege fraudulent conduct. *Id.* at 406, 869 N.E.2d at 195. In discussing whether the "discovery rule" should apply to § 3-420 conversion, another case cited by Plaintiffs explains that "the vast majority of authority runs strongly against" such an application, "in the absence of fraudulent concealment on the part of *the defendant asserting the defense of the statute of limitations.*" *Haddad's of Ill., Inc. v. Credit Union 1 Credit Union*, 286 Ill. App. 3d 1069, 1073, 678 N.E.2d 322, 325 (4th Dist. 1997) (emphasis added). The Seventh Circuit has also addressed the "discovery rule" for an "ongoing conduct" claim asserted pursuant to § 3-307. *Travelers Casualty*, 480 F.3d at 504. (Travelers Casualty argued that its claim should accrue when it *discovered* the course of wrongful conduct–not when that last instance occurred, as Plaintiffs here argue.) The court determined that "the overwhelming majority of cases reject a discovery rule for conversion of a negotiable instrument" and, in *dicta*, concluded that each occurrence should start the statute of limitations clock ticking. *Id.* (The court's decision did not depend on this rule because it determined that even under a "discovery rule," the embezzlement "should have been discovered" prior to the running of the statute of limitations. *Id.*) As the court explained, "[t]he decisive consideration is that someone who fails to discover within the statutory period that his property has been stolen has only himself to blame for the belatedness of his discovery." *Id.*

The court concludes the discovery rule is inapplicable here. Plaintiffs do not argue that the discovery rule should apply–only that Rome's conduct constituted a continuing violation. Moreover, while Plaintiffs do allege fraudulent concealment on Rome's part, they do not allege that Defendant concealed Rome's wrongdoing, which, as *Haddad's* shows, would be fatal to any "discovery rule" argument Plaintiffs might make. (Compl. ¶¶ 114-16.)

application of the continuing violation rule to a § 3-420 claim for conversion of a negotiable instrument, explaining that "the continuing violation rule does not apply to a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing." *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005).  The court concludes that because Plaintiffs filed suit on April 13, 2009, all claims for conversion pursuant to § 3-307 that accrued prior to April 13, 2006, must be dismissed.

Defendant has an additional defense to Plaintiffs' § 3-307 conversion claim to the extent that claim is based on checks deposited at other banks but drawn on Defendant's bank.  Such claims are barred by the ratification doctrine, Defendant urges, because Plaintiffs have already sued the depositary banks.  (Def.'s Br. at 6.)  Judge Shadur examined the ratification doctrine at some length in *P.M.F. Services, Inc. v. Grady*, 698 F.Supp. 141 (N.D. Ill. 1988), noting the "paucity of case law" on the subject.  *Id.* at 143 & n. 5.  Essentially, the ratification doctrine estops a payee from suing both a collecting bank and a drawee bank.  *Id.* at 144 n.6 (quoting *Central, Inc. v. Cache National Bank*, 748 P.2d 351, 355 (Colo. App. 1987) to the effect that "[t]he purpose of [the ratification] theory, generally, is to require the payee to make an election between suing the drawee bank or the collecting bank").  Plaintiffs contend that the ratification doctrine applies only in cases where a signature has been forged.  (Response at 22-23.)

The court need not reach this issue, however.  Plaintiffs have disclaimed any theory of conversion other than that pursuant to § 3-307, so the only question is whether the ratification doctrine bars § 3-307 claims for checks drawn on Defendant's bank and deposited elsewhere.  Plaintiffs cannot state a claim based on those checks pursuant to § 3-307 because that section only applies to the "taker" of an instrument, and the drawee of an instrument deposited elsewhere is not a taker.  Accordingly, all "conversion" (§ 3-307) claims stemming from checks not deposited at Defendant's bank will be dismissed.  As neither party has briefed whether the remaining claims should otherwise be dismissed for failing to meet the requirements of § 3-307, the court makes no

further comment on this claim.

**IV.    Remaining Common Law Claims (Counts III, IV, and VI)**

Finally, Defendant argues that Plaintiffs' common law claims for breach of contract, negligence amounting to bad faith, and aiding and abetting Rome's breach of fiduciary duty are either preempted or displaced by UCC §§ 3-307, 3-308.  (Def.'s Br. at 5-6.)  The Seventh Circuit has explained that when a provision of the UCC "fits the facts of the case to a T, no room is left for recharacterizations intended to circumvent the statute of limitations applicable to such claims.  It is one thing to fill gaps in the Uniform Commercial Code and another to contradict it by calling a UCC claim something else."  *Travelers Casualty*, 480 F.3d at 505.

Plaintiffs respond by citing to *Continental Casualty* for the proposition that "nothing in the UCC . . . has displaced [the common-law duty of ordinary care]."  329 Ill. App. 3d at 698, 768 N.E.2d at 362.  *Continental Casualty*, however, notes explicitly that the "UCC authorizes the use of contract or equity claims *where the UCC does not cover a particular topic or transaction.*"  *Id.* (emphasis added).  Plaintiffs seize upon Defendant's argument that "Plaintiffs may not bring claims under Section 4-401 or 4-320 of the UCC," and urge that this means that their common law claims are not displaced.  (Response at 21-22.)  Indeed, *Continental Casualty* explains that "[t]he UCC does not immunize a bank from its own failure to exercise ordinary care in handling its depositor's accounts," and that § 4-401(a) does not displace a common law breach of contract claim.  329 Ill. App. 3d at 699, 768 N.E.2d at 362.  As Defendant points out, however, *Continental Casualty* concluded § 4-401 did not displace the contract claim in that case because the UCC contains no provision dealing specifically with the facts alleged–that "an individual present[ed] a corporate check payable to the bank and then instruct[ed] the bank to divert the proceeds of the check to his own benefit."  329 Ill. App. 3d at 698, 768 N.E.2d at 362.  The case law is consistent: the UCC displaces common law remedies to the extent that the facts alleged fit a provision of the UCC.

The court agrees with Defendant that some of the allegations in Plaintiffs' complaint may

well fit UCC provisions. Unfortunately, however, here as in *Mutual Service Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601 (7th Cir. 2001) "the bank has made no attempt to show how and why the common-law claim that [Plaintiffs have] asserted might be inconsistent with relief under the Code." *Id.* at 621. Defendant's briefs have not specifically tied any provision of the UCC to any of Plaintiffs' claims, instead arguing only that the UCC provisions are "directly applicable to the facts of this case." (Def.'s Br. at 5.) The court declines to dismiss the common law claims.

## CONCLUSION

Defendant's motion to dismiss [91] is granted in part and denied in part. The court grants Defendant's motion as it relates to § 4-401 claims except for checks paid into Judith Feiger's account. The court also dismisses all conversion claims except those brought pursuant to § 3-307 that accrued after April 6, 2006 for checks deposited at Defendant's bank. Defendant's motion to dismiss is otherwise denied.

ENTER:

Dated: March 28, 2011

_____
REBECCA R. PALLMEYER
United States District Judge