**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CRAWFORD SUPPLY GROUP, INC., FEIGER FAMILY PROPERTIES, LLC; the ESTATE OF MIRIAM FEIGER; JAMES MAINZER, as co-trustee of the Feiger Irrevocable Charitable Lead Trust and the Steven Feiger Children's Trust, and as trustee of the Siegfried-Steven 1983 Trust, the Siegfried-Steven 1985 Trust, the Judith Feiger Trust, the Siegfried-Judith 1983 Trust, the Siegfried-Judith 1985 Trust, the Steven-Jordyn Feiger 1988 Trust, and the Steven-Zachary Feiger 1988 Trust; the FEIGER FAMILY INVESTMENT PARTNERSHIP; and JUDITH FEIGER, individually, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A., <br><br> Defendant. | No. 09 C 2513 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, the Feiger Family Investment Partnership ("FFIP") and other related entities (collectively, "Feiger"), have sued Defendant Bank of America ("the Bank") for the role played by the bank's predecessor in an embezzlement scheme orchestrated by Feiger's accountant and trustee, Robert Rome. The Bank now seeks partial summary judgment absolving it from liability for eight checks that the Bank paid, between March 2004 and April 2005, from the account of FFIP into the personal account of Robert Rome at Harris Bank.[1] The court has previously examined many of the allegations made by Plaintiffs in ruling on Defendant's motion to dismiss, which was granted in part and denied in part. *See Crawford Supply Group, Inc. v. Bank of America, N.A.*, No. 09 C 2513, 2011 WL 1131292 (N.D. Ill. March 28, 2011). In that ruling, the court dismissed all of

---

[1] These transactions actually occurred at LaSalle Bank, which has since been acquired by Bank of America.

Plaintiff FFIP's claims under the Uniform Commercial Code; to the extent the Bank now seeks summary judgment on those claims, the motion is moot. The Bank's motion argues that FFIP's common law claims are supplanted by the UCC, but the court explained earlier that common law claims survive unless they are inconsistent with the UCC, 2011 WL 1131292, at *15, and the Bank has not yet explained how FFIP's common law claims are inconsistent with the Code. Finally, the Bank argues that there are no disputes of material fact as to whether the Bank acted with actual knowledge of Rome's wrongdoing or ignored it in bad faith and should therefore be shielded from liability by the Illinois Fiduciary Obligations Act ("FOA"), 760 ILCS 65/1 *et seq.* For the reasons explained herein, the court disagrees and denies the motion for summary judgment.

## **BACKGROUND**

As noted, Defendant Bank of America's motion focuses on eight checks paid from the Feiger Family Investment Partnership account at its bank into Robert Rome's personal account at Harris Bank. (Def.'s 56.1(a) ¶¶ 12, 16, 17.) The eight checks, signed by Robert Rome and made payable to "Robert Rome, Trustee," are in the following amounts: $17,000, April 18, 2005; $16,000, March 17, 2005; $16,000, February 17, 2005; $17,000, January 17, 2005; $35,000, July 12, 2004; $16,000, June 7, 2004; $16,000, March 17, 2004; $18,000, March 10, 2004. (*Id.* ¶¶ 15, 16; Def.'s Ex. 1.) The parties agree that two of these checks were flagged for additional review, but eventually cleared. (Def.'s 56.1(a) ¶ 17; Pl.'s Resp. ¶ 17; Def.'s Supp. ¶ 19; Pl.'s Supp. Resp. ¶ 19.) Defendant contends that two of the checks were flagged by "standard industry software" (the name of the software or other details about it are not specified) either because the amount of the checks was greater than the average amount of the checks drawn on that account, or because their serial numbers were "out of range." (Def.'s 56.1(a) ¶ 17.)[2] (*Id.*) According to Defendant, one check,

---

[2] The parties have not explained this, but the court presumes a check "out of range" is one that is not sequential with other checks that have been recently drawn on that account. Defendant does not specify for which of these reasons the checks were flagged, or if both were
(continued...)

No. 1119, written July 12, 2004, for $35,000, was reviewed by a check analyst and approved without further inquiry; the Bank offers no information concerning the identity of the check analyst, what he/she reviewed it for, or the reason(s) the check was ultimately approved for payment. (*Id.*) Defendant reports that the second flagged check, Check No. 1095, dated March 17, 2005, and drawn for $16,000, "was apparently referred to the account officer, and he approved it." (*Id.*) Again, the Bank offers no further details (*id.* ¶¶ 17), but the check bears the notation "Marcus Montanye 4-7984 - 4-0889" and "SE[]F SIG OK." (Def.'s Supp. Resp. ¶ 21.) Defendant does not explain this notation, but Plaintiffs assert that it was account officer Marcus Montanye who approved the second check, and then in his deposition denied having done so (the court notes Montanye also testified that he does not remember the check). (Pl.'s Resp. ¶ 17; Pl.'s Ex. 14, Deposition of Marcus Montanye, at 46-50.) (*Id.*) Defendant has not identified who actually reviewed the checks at issue; instead, the Bank asserts that two individuals named June Kroll and Susie Wong would have been the "analyst management team responsible for review" of the flagged checks, but also that a review "would have been performed by all analysts." (Def.'s Supp. Resp. ¶ 19.)

In January 2003, more than a year before the first of the checks at issue was paid by the Bank, the Bank conducted a field audit of a company with which Rome was affiliated named Northwestern Golf, to which the Bank had loaned $20 million. (Def.'s Supp. Resp. ¶¶ 24, 26.) That audit "identified a complete break-down of controls, a complete lack of proper reporting procedures, computer system manipulation, and severe accounting regularities." (*Id.*) The Bank concluded that "[t]hese issues have cast a serious doubt about the current management's ability to exercise prudent and proper decision making ability" and raised serious questions as to "the ability of the business to continue as an on-going business concern." (*Id.*) Bank representatives met with

---

[2](...continued)
flagged for the same reason or reasons.

3

Northwestern Golf representatives, who "maintained that these were all unintentional accounting system issues and not intentional fraud." (*Id.* ¶ 25.) Mitch Rasky, a loan officer in the Bank's asset-based lending group, nevertheless believed that one accounting regularity—characterizing past due receivables as current receivables—was intentional on Northwestern Golf's part. (*Id.*)

In February 2003, these irregularities were brought to the attention of LaSalle Bank CEO Norm Bobins, who said he "would like to work with this client as long as possible. I do not believe they are dishonest, but I do believe they have made mistakes. I have particular confidence in their accountant, Bob Rome." (*Id.* ¶ 26.) Four months later, however, on June 17, 2003, Rasky wrote a memo recommending that the Bank "immediately bring in a forensics accountant who can help us build up a case against management and Rome & Assoc (their accountant) for what appears to be gross irregularities." (*Id.* ¶ 27.) On February 25, 2005, LaSalle Business Credit, an entity affiliated with the Bank, sued Rome, Rome Associates, and a number of other individuals involved with Northwestern Golf for fraud, alleging that they had "engaged in a lengthy and clandestine scheme in which they falsified numerous financial statements, Collateral Reports and other financial reports and documents." (*Id.* ¶ 28.)

Before the first of the checks at issue in this case were deposited, Bank officials began investigating a second business with which Rome was involved. On March 4, 2004, accountant Craig Graff executed an affidavit related to Builders Plumbing & Heating Supply Co., which had declared bankruptcy in December 2003. (*Id.* ¶¶ 32, 33.) Graff stated that his review of Builders' financial books revealed that Builders' bankruptcy estate "may be entitled to recover substantial damages from [Builders'] independent auditor, Rome Associates" because Rome Associates lacked independence from its client, and because the October 30, 2003, financial statement it certified "contain[ed] material misrepresentations." (*Id.* ¶ 32.) Graff also concluded that Builders and one of its subsidiaries had delivered "kitchen cabinets, fixtures and appliances" to Rome worth more than $500,000 over the course of several years, that neither Rome nor anyone else paid for these

4

goods, and that there had been a "fictitious" payment from Rome to Builders of $225,000.  (*Id.* ¶ 34.)  On June 22, 2005, the bank sued Rome, Rome Associates, and another individual for $14.6 million for accounting malpractice in connection with the Builders Plumbing & Heating bankruptcy, and eventually settled the case with Rome's insurance carrier for $2 million.  (*Id.* ¶ 38.)

The Builders bankruptcy and the Northwestern Golf lawsuit threatened the financial situation of Rome and Rome Associates.  As of January 12, 2004, the Bank recognized that Rome Associates "ha[d] about $1.1 [million] of accounts receivable of which $235,000 was from KDA [another company that had gone into bankruptcy] and Northwestern Golf, and $270,000 additionally [was] over 120 [days] past due."  (*Id.* ¶ 43.)  On April 1, 2004, the bank downgraded Rome Associates' credit, and a week later Bruce Lubin, the head of commercial banking at Defendant's bank, wrote an e-mail acknowledging that "we are clearly aware and concerned about the viability of the firm." (*Id.* ¶¶ 43, 48.)  At around this same time, the Bank issued a notice of default to Rome Associates and entered into a forbearance agreement in exchange for an agreement to shift $240,000 in term debt to Rome's personal mortgage.  (*Id.* ¶ 43.)  This step was apparently insufficient to resolve the Bank's concerns; on September 2, 2004, the Bank asked the firm to move its banking business to another financial institution.  (*Id.*)  In October 2004, the Bank identified, as a "key risk issue" for Rome Associates, that the firm had "failed to pay most of its payroll tax obligations during the first six months of the year" and that Robert Rome "has effectively exhausted his access to capital."  (*Id.* ¶ 52.)  The Bank arranged to shift $242,348 of Rome Associates term debt to Rome's personal mortgage with ABN AMRO Mortgage Group, an affiliate of the Bank, and refinance Rome's $600,000 home equity line of credit, resulting in an increase in that personal mortgage from $1.6 million to $2.475 million.  (*Id.* ¶ 54.)  This brought Rome's principal and interest payment to approximately $14,000 per month (*id.* ¶ 55), in a year which Rome and his wife reported

income of only $160,413. (Pl.'s Supp. ¶ 56.)[3]

On April 1, 2004, Lubin sent an e-mail to (unidentified) other bankers, asking whether it would be appropriate to advise other clients of Rome's that Rome Associates' credit had been downgraded. (*Id.* ¶ 59.) Brian Greenblatt, a division head at the Bank, sent Lubin, by e-mail, a list of clients, including Plaintiff Crawford Supply Group, and suggested in the e-mail message, "Let's discuss a strategy." (*Id.* ¶ 60.) On July 11, 2005, Lubin asked several other employees whether they believed that Crawford Supply Group "would fire Rome as their auditor." (*Id.* ¶ 61.) Greenblatt replied: "Unfortunately no. And with all the potential litigation I think we need to stay silent." (*Id.*)

Plaintiffs claim that on June 1, 2004, Marcus Montanye, the Bank employee who Plaintiffs allege made a notation suggesting that he reviewed one of the flagged checks, sent an e-mail message to other bankers containing an article in which Crain's Chicago Business reported that the F.B.I. and U.S. Attorney's Office were investigating the Builders Plumbing fraud. (Pl.'s Supp. ¶ 36.) Defendant insists that while Montanye had a "relationship" with Crawford Supply Group and Feiger Family Properties, LLC, he did "not have any involvement with Feiger Family Investment Partnership," but Defendant admits that Montanye sent an article from Crain's on or about June 1, 2004, to Bruce Lubin. (Def.'s Supp. Resp. ¶ 36.)

Plaintiffs contend that Defendant benefitted from Rome's embezzlement scheme. For example, Plaintiffs allege that Rome embezzled a $45,750 check from one of the Plaintiffs' accounts (not the FFIP account) on December 15, 2003; deposited that check in his personal account at Defendant's bank, which previously had a balance of only $1,939; and then used those deposited funds to make his $13,443 mortgage payment to ABN AMRO. (Pl.'s Supp. ¶ 66.)

---

[3] Defendant objects that Rome's tax return is hearsay (Def.'s Supp. Resp. ¶ 56), but for purposes of this decision the court considers the information not for its truth, but as evidence of what information the Bank could have considered in connection with the mortgage financing.

**DISCUSSION**

Defendant seeks partial summary judgment with regard to eight checks drawn on the Feiger Family Partnership account held at Defendant's bank and deposited into Rome's account at Harris Bank between March 2004 and April 2005. Defendant urges that it is shielded from liability by the three-year statute of limitations, because it is a holder in due course, and by the Fiduciary Obligations Act.

Before addressing those arguments, the court pauses to note that its earlier ruling disposes of any claims regarding the eight FFIP checks that arise under the Uniform Commercial Code. In that earlier ruling, the court dismissed all claims in Count I, alleging violations of UCC § 4-401, except for those related to the Judith Feiger account, because § 4-401 "requires a check to be 'deposited only in the account of the named payee,' and that account allegedly did not belong to Judith Feiger."[4] *Crawford Supply Group*, 2011 WL 1131292, at *12. No claims related to the FFIP checks remain in Count I. With respect to Plaintiffs' conversion claim in Count II, the court concluded that those claims were governed by UCC § 3-307, and dismissed such claims for all checks not deposited at Defendant's bank or deposited prior to April 13, 2006. *Id.* at *13. The eight FFIP checks at issue here fall into both categories. With respect to the common law claims asserted in Counts III, IV, and VI—breach of contract, negligence amounting to bad faith, and aiding and abetting Rome's breach of fiduciary duty—the court acknowledged that the UCC may displace such claims, but declined to dismiss them because Defendant did not explain how and why the

---

[4] Plaintiffs have now also asserted that Rome was not authorized to open the FFIP account, but the court declines to address the argument. Plaintiffs' complaint does not assert that Rome was not authorized to conduct business on the FFIP account, or that the account was not opened in accordance with the proper procedures. The Seventh Circuit has explained that a plaintiff waives alternative bases for claims if they are not raised for the first time until briefing during summary judgment proceedings. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009). *See also Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (citation and quotation omitted).
.

common law claims were in fact displaced. *Id.* at *14-15. Finally, the court dismissed Count V, alleging a cause of action pursuant to the Fiduciary Obligations Act, as duplicative of the common law claims asserted in Counts III and IV. *Id.* at *10-11. Those common law claims are the only ones relating to the eight checks that survived the motion to dismiss.

In support of its motion for summary judgment, Defendant argues that Plaintiffs' § 3-306 conversion claims fail because the Bank was a "holder in due course" as to the eight checks at issue. (Def.'s Br. at 8.) Because the court dismissed Plaintiffs' conversion claims, the court need not reach this argument. What remains of this motion are Defendant's statute of limitations defense and its argument that the Fiduciary Obligations Act bars Plaintiffs' claims. The court addresses those arguments in turn, drawing all reasonable inferences in favor of the nonmoving party. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993 (7th Cir. 2011).

**A.    Statute of Limitations**

The court turns, first, to Defendant's argument that because the checks at issue were negotiated more than three years prior to the filing of the April 13, 2009 complaint, any claims related to them are barred by the statute of limitations. The statute of limitations provision Defendant cites, 810 ILCS 5/3-118(g), applies to claims brought pursuant to UCC §§ 3-306 and 3-307. The court concluded previously that this statute of limitations provision dooms all conversion claims that arise under § 3-307 and accrued prior to April 13, 2006, and dismissed all § 3-307 claims based on checks not deposited at Defendant Bank. *Crawford Supply Group*, 2011 WL 1131292, at *13, 14. In addition, the court previously dismissed claims based on checks not deposited at Defendant's bank. *Id.* at *14.

Defendant insists that §§ 3-306 and 3-307 require dismissal of all other claims related to these checks as well. The Seventh Circuit explains that where a provision of the UCC "fits the facts of the case to a T, no room is left for recharacterizations intended to circumvent the statute of limitations applicable to such claims. It is one thing to fill gaps in the Uniform Commercial Code and

8

another to contradict it by calling a UCC claim something else." *Travelers Cas. & Sur. Co. of America, Inc. v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499, 505 (7th Cir. 2007). In ruling on Defendant's motion to dismiss, this court also addressed that argument, concluding that "[t]he court agrees with Defendant that some of the allegations in Plaintiffs' complaint may well fit UCC provisions. Unfortunately, however, here . . . the bank has made no attempt to show how and why the common-law claim that [Plaintiffs have] asserted might be inconsistent with relief under the Code." *Crawford Supply Group*, 2011 WL 1131292, at *15 (citation and quotation omitted). The court expected the Bank to make that attempt in this motion, but it has not done so. That the argument was not made in the Bank's opening brief is understandable, as that brief was filed before the court issued its decision on the motion to dismiss; but Defendant's reply brief makes no mention of the preemption issue.

With respect to the eight checks at issue in this motion, Plaintiffs' conversion claims have been dismissed as untimely, but the court declines to expand the scope of that ruling.

**B.    Fiduciary Obligations Act**

As it did on the motion to dismiss, Defendant Bank has argued that the Fiduciary Obligations Act requires dismissal of all remaining claims. The Act explains that when a fiduciary makes a deposit to his personal account of funds or a check drawn on an account in the name of his principal, the bank has no duty of inquiry and is authorized to honor the deposit

> unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

760 ILCS 65/9. In its motion to dismiss, the Bank argued that Plaintiffs' allegations were insufficient to overcome this bar. This court disagreed, noting the "totality of the allegations—in particular, that Defendant began investigating Rome's understatement of personal liabilities and his part in the Northwestern Golf fraud several years before Plaintiffs became aware of his embezzlement of their

9

funds." Those allegations, the court determined, were sufficient to support an inference of bad faith on Defendant's part. *Crawford Supply Group*, 2011 WL 1131292, at *9.

Defendant now argues that the summary judgment record defeats any bad faith finding. Whatever some individuals at the Bank knew or suspected about Rome, the Bank urges, "such knowledge is irrelevant unless the person who reviewed the checks had such knowledge (or unless such knowledge can be imputed to the reviewer because the persons who had such knowledge were obligated to communicate it to the reviewer)." (Def.'s Br. at 4.) In support of this contention, Defendant points to 810 ILCS 5/1-202(f):

> Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.

The court is uncertain that this provision would require summary judgment for the Bank; there appears to be a genuine dispute as to whether the Bank exercised due diligence in failing to monitor Rome's checking activity more closely. The court need not decide that issue, however, because the cited provision is part of the Illinois Uniform Commercial Code, and, as explained previously, no UCC claims are outstanding with respect to the checks at issue here

Defendant insists the UCC defense is nevertheless relevant here (Reply at 9), but the court is less certain. Defendant cites *County of Macon v. Edgcomb*, 274 Ill.App.3d 432, 654 N.E.2d 598 (4th Dist. 1995), where the court invoked an earlier version of § 1-202(f) in dismissing claims against a bank because "[t]here is no indication the [bank] employee who took [the] check .. . for payment on [a loan to the bank] had any knowledge that check, which indicated it was drawn on a personal account, was drawn on an account into which fiduciary funds had been deposited." *Id.*

10

at 439, 654 N.E.2d at 603. Although the *Edgcomb* opinion is less than explicit about what claims were being pursued, it appears that UCC claims were involved. *Id.* at 437, 654 N.E.2d at 602. Similarly, in *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 832 N.E.2d 376 (1st Dist. 2005), the plaintiff invoked provisions of the UCC in addressing claims that an attorney for the executor of an estate had converted three checks from the estate to his own use. *Id.* at 41, 832 N.E.2d at 379. Neither of those cases directly supports Defendant's assertion that the UCC definition of "knowledge" governs that term within the Illinois Fiduciary Obligations Act. Further, Plaintiffs note, while the FOA refers to the knowledge of the "bank," UCC § 1-202 explains that a "person" or "individual" has knowledge, which can be imputed to the organization if "it is brought to the attention of the individual conducting [the] transaction." (Response at 9 n.7.)

In any event, this court concluded earlier that Plaintiffs' allegations were sufficient to support an inference of bad faith on Defendant's part, but not sufficient to support an inference of actual knowledge. *Crawford Supply Group*, 2011 WL 1131292, at *9. The question at this stage, then, is whether the summary judgment record demonstrates that there are no disputes of fact as to whether Defendant acted in bad faith in paying checks from the FFIP account to Rome's personal accounts a Harris Bank. As explained earlier, bad faith can be shown "where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order [ ] to avoid knowledge that the fiduciary is acting improperly." *Id.* at *8 (quoting *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *3 (N.D. Ill. Sept. 5, 1996)). In making a determination on the question of bad faith, courts consider "whether it was commercially unjustifiable for the payee to disregard and refuse to learn facts readily available. . . . At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive." *Crawford Supply Group*, 2011 WL 1131292, at *8 (quoting *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987)). In this case, as in *Ohio Casualty*, "[w]hile probably none of the matters alleged, standing alone, would be sufficient to demonstrate bad faith, their totality raises enough of an inference of bad faith for

11

pleading purposes." 1996 WL 507292, at *4.[5]

Defendant insists the summary judgment record defeats any inference of bad faith because Plaintiffs do not cite "any irregularities with respect to FFIP's account from which it could be concluded that the bank wilfully failed to discover Rome's embezzlement from FFIP." (Reply at 12.) In Defendant's view, not even a showing that the Bank "willfully ignored facts relating to Rome's embezzlement from other plaintiffs" would be sufficient "to establish bad faith as to FFIP." (*Id.* at 13.) In support, Defendant again cites *Edgcomb*, where the court observed that even after the bank took one check for payment of a personal obligation from a fiduciary's account, the bank did not necessarily have a "duty to inquire as to all checks involving" that fiduciary. 274 Ill. App. 3d at 441, 654 N.E.2d at 604. Addressing UCC claims only, the *Edgcomb* court went on to explain that a fiduciary's past use of fiduciary funds for his personal benefit "may be important evidence" of the bank's "actual knowledge [that] the particular transaction before it is in breach of the fiduciary's duty, but it does not automatically result in liability for all transactions which follow." 274 Ill. App. 3d at 441, 654 N.E.2d at 605. With respect to those transactions that follow, the question "is not whether it would have been reasonable to inquire further. The question is whether [the bank] acted in bad faith in failing to do so." 274 Ill. App. 3d at 441, 654 N.E.2d at 604-05. Thus, assuming the relevance of *Edgcomb* to non-UCC claims, it does not change the analysis—the question remains whether Defendant acted in bad faith.

*Edgcomb* does explain that the Bank's knowledge of one breach of fiduciary duty does not render it responsible for all subsequent breaches. Defendant emphasizes this in arguing that, while

---

[5] Defendant suggests this court erred in citing to that statement in *Ohio Casualty* because Judge Grady, in a subsequent opinion, "reconsidered" that statement. (Reply at 12.) In fact, Judge Grady's subsequent opinion did not reconsider whether this statement was an accurate statement of the law, but rather reconsidered whether the statement was accurate as to the facts of *Ohio Casualty* "after reviewing the third amended complaint against the relevant provisions of the UCC and the [Fiduciary Obligations Act]." *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1997 WL 428515, at *4 (N.D. Ill. July 23, 1997).

12

the financial statements from Builders Plumbing and Northwestern Golf were "questionable," or even "fraudulent," whether these "were isolated incidents or just the 'tip of the iceberg' was unknown at the time, and the Bank was not required to undertake an investigation to find out." (Reply at 14.) Thus, the Bank urges, it was not required to launch an investigation solely because someone could have speculated that Rome's financial straits would lead him to steal, and it had "no duty to advise Crawford to fire Rome as their auditor or to disclose Rome's alleged wrongdoing." (Reply at 15.) The court agrees generally that a bank is not required to undertake an investigation whenever it sees questionable financial statement or learns of a client's financial difficulties, nor does the bank have a general duty to warn of an auditor's wrongdoing—unless its failure to do so amounts to bad faith, as Plaintiffs have alleged here.

Defendant has not satisfied the court that there is no genuine issue of material fact on this issue. Plaintiffs note the circumstances surrounding the Northwestern Golf fraud. Defendant began investigating irregularities in Northwestern Golf's account in January 2003, and by June 2003, at least one analyst at Defendant's bank felt there were "gross irregularities," and suggested bringing in forensic analysts to build a case against Rome and his company. (Def.'s Supp. Resp. ¶¶ 24-28.) By February 2005, LaSalle Business Credit, an entity affiliated with the Bank, had brought suit against Rome, Rome Associates, and others for engaging in a "lengthy and clandestine scheme in which they falsified numerous financial statements, Collateral Reports and other financial reports and documents . . . ." (*Id.* ¶ 28.) In March 2004, Defendant learned that Rome was involved in more irregular accounting transactions, this time with Builders Plumbing, that included "material misrepresentations." (Def.'s Supp. Resp. ¶ 34.) Bank officers learned that Rome had accepted $500,000 worth of goods from Builders without any payment in exchange other than a $225,000 phantom payment. (*Id.* ¶ 34.) Defendant eventually sued Rome for $14.6 million, and settled for $2 million. (*Id.* ¶ 38.)

Defendant argues that it is "plausible . . . that while Rome had no scruples against enabling

13

his clients to defraud LaSalle Bank and other creditors, he was loyal and faithful to his clients and his principals (especially if they were paying him)." (Reply at 14.) The court agrees that this is plausible. But the question before the court is not whether Defendant acted consistent with one plausible scenario, but whether its ignorance of another plausible scenario—that Rome was only able to meet his obligations through embezzlement—amounted to bad faith. Defendant's argument does not answer this question.

Beginning in January 2004, Defendant became increasingly concerned about Rome Associates and its ability to meet its obligations. The Bank downgraded Rome Associates' credit and began questioning the firm's viability. (Def.'s Supp. Resp. ¶ 43, 48.) As part of its response to these concerns, the Bank helped Rome transfer $240,000 of Rome Associates' debt to Rome's personal mortgage, held by the Bank's affiliate ABN AMRO, which required payments of $14,000 per month. (*Id.* ¶¶ 43, 54, 55.) Rome's family income of $160,413, as set forth in his 2004 tax return, was insufficient to cover these obligations. (Pl.'s Supp. ¶ 56.) Then, in April 2004, Bruce Lubin, the head of commercial lending, asked other bankers to review Rome's auditing contracts and to "discuss a strategy." (Def.'s 56.1(a) ¶¶ 59, 60.) On July 11, 2005, Lubin asked Greenblatt whether Crawford Supply Group would "fire Rome as their auditor," to which Greenblatt replied, "Unfortunately no. And with all the potential litigation I think we need to stay silent." (*Id.* ¶ 61, 62.) Plaintiffs contend that the Bank had "perverse incentives *not to investigate* Rome's transactions in the Plaintiffs' accounts because, among other things, the bank was benefitting from Rome's embezzlement, as Rome used the embezzled funds to stay afloat and make mortgage and other payments to [Defendant] and other creditors." (Response at 16.) The court is unable to conclude, based on the record, that the Bank must have been ignoring Rome's embezzlement because it wanted to recover the money it had lent him. At the same time, however, the court is also unable to conclude that no factfinder could determine that the Bank was so motivated; more specifically, the court is unable to determine that no reasonable jury would find Defendant's ignorance of the

14

situation was willful and in bad faith.

The issue regarding the flagged checks also raises a number of questions. Marcus Montanye either denies or does not recall signing off on one of the two checks that were flagged by Defendant's software. (Pl.'s Supp. ¶ 21; Def.'s Supp. Resp. ¶ 22.) The record evidence does not make clear why the checks were flagged, who reviewed the checks, or why they were ultimately approved. (Def.'s 56.1(a) ¶ 17, 20; Def.'s Supp. Resp. ¶ 19, 21.) Montanye, whose name appears on one of the checks, was clearly familiar with several of the Feiger family accounts as well as Rome, and in June 2004 forwarded a Crain's article about the investigation into Rome to other bank employees. (Pl.'s Supp. ¶ 36; Def.'s Supp. Resp. ¶ 21, 36.)

These circumstances are sufficient to establish a genuine dispute as to whether Defendant suspected that Rome was "acting improperly and deliberately refrain[ed] from investigating in order [ ] to avoid knowledge" that he was acting improperly. *Crawford Supply Group*, 2011 WL 1131292, at *8. Greenblatt, for example, may have had other reasons for suggesting that Defendant "stay silent" about the ongoing investigations into Rome, but that is not the only finding supported by the record, and the Bank's activities suggest there is a genuine dispute as to "whether it was commercially unjustifiable for the payee to disregard and refuse to learn facts readily available." *Id.* Rome and Rome Associates were obviously squeezed for money, and Defendant has not offered a satisfactory explanation of what happened to the checks that were flagged during this time period. Defendant's motion for partial summary judgment that it is shielded from liability by the FOA is denied.

## CONCLUSION

For the aforementioned reasons, Defendant's motion for partial summary judgment [134] is denied.

ENTER:

*[signature: Rebecca R. Pallmeyer]*

Dated: August 23, 2011

_____
REBECCA R. PALLMEYER
United States District Judge