**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CRAWFORD SUPPLY GROUP, INC.; FEIGER FAMILY PROPERTIES, LLC; JAMES MAINZER, as co-trustee of the Feiger Irrevocable Charitable Lead Trust and the Steven Feiger Children's Trust, and as trustee of the Siegfried-Steven 1983 Trust, the Siegfried-Steven 1985 Trust, the Judith Feiger Trust, the Siegfried-Judith 1983 Trust, the Siegfried-Judith 1985 Trust, the Steven-Jordyn Feiger 1988 Trust, and the Steven-Zachary Feiger 1988 Trust; the FEIGER FAMILY INVESTMENT PARTNERSHIP; SIG FEIGER, as the executor of the Estate of Miriam Feiger and as co-trustee of the Feiger Irrevocable Charitable Lead Trust; and JUDITH FEIGER, individually and as cotrustee of the Steven Feiger Children's Trust, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A., <br><br> Defendant. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>No. 09 C 2513<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

As explained at length elsewhere, Plaintiffs in this case are a group of trusts and companies controlled by the Feiger Family. They have sued Defendant, the Bank of America, successor to LaSalle Bank (the "Bank"), alleging it is liable for losses Plaintiffs suffered when their accountant and fiduciary, Robert Rome, embezzled millions of dollars from Plaintiffs by drawing checks on their accounts at the Bank and depositing the proceeds in his personal accounts. The court has issued several opinions and assumes the reader's familiarity with them. *See Crawford Supply Group, Inc. v. Bank of America, N.A.*, No. 09 C 2513, 2011 WL 3704262 (N.D. Ill. Aug. 23, 2011); *Crawford Supply Group, Inc. v. Bank of America, N.A.*, No. 09 C 2513, 2011 WL 1131292 (N.D. Ill. Mar. 28, 2011); *Crawford Supply Group, Inc. v. Bank of America, N.A.*, No. 09 C 2513, 2010 WL 320299

(N.D. Ill. Jan. 21, 2010).

In Count VI of their amended complaint, Plaintiffs allege that Defendant is liable for aiding and abetting Rome's breach of fiduciary duty. The Bank now moves for partial summary judgment on that count and for judgment in its favor on claims brought by one of the Feiger entities, referred to here as the Children's Trust. For the reasons explained here, the motion for partial summary judgment on Count VI is denied, and the motion for judgment in the Bank's favor against the Children's Trust is otherwise granted.

**FACTUAL BACKGROUND**

When Robert Rome served as a fiduciary, in various capacities, to the Feiger companies and trusts, he breached his duties and robbed the Plaintiffs of millions of dollars. Rome's scheme primarily involved drawing checks on Plaintiffs' accounts and depositing the proceeds into his personal accounts. Plaintiffs' suit against Rome has since settled. In this lawsuit, Plaintiffs seek to recover against the Bank, asserting that the Bank failed to monitor accounts over which Rome had control, despite Bank officials' knowledge that Rome had a history of deceitful conduct and was suffering from serious financial instability. The court has recounted the details regarding the Bank's relationship with Rome in prior opinions. *See Crawford Supply Group*, 2011 WL 3704262 *2-4; *Crawford Supply Group*, 2011 WL 1131292 *2-3. Significantly, before any of the checks at issue in this suit were deposited, the Bank had already begun to investigate Rome and his company, Rome Associates, for what appeared to be accounting malpractice with regard to two other clients. (Def.'s Resp. to Feiger Family Investment Partnership's Local Rule 56.1(B)(3) Statement of Additional Facts (hereinafter "Def.'s Resp. to FFIP 56.1(B)(3)") [212], at ¶¶ 24, 32.) First, in January 2003, the Bank discovered "severe accounting irregularities" in the financial statements of one of Rome's clients, Northwestern Golf. (*Id*. at ¶ 24.) Then, in March 2004, the Bank learned that Rome Associates had made "material misrepresentations" about the assets and liabilities of

2

yet another client, Builders Plumbing & Heating Supply Co. (*Id*. at ¶ 32.) The Bank's investigation ultimately prompted the Bank to file two lawsuits against Rome and his company in 2005. (*Id*. at ¶¶ 28, 38.)

The bankruptcy of Northwestern Golf and Builders Plumbing, the corresponding negative publicity, and the pending lawsuits appeared to threaten the financial stability of Rome Associates. On April 1, 2004, the Bank downgraded Rome Associates' credit. (*Id*. at ¶ 43.) Later that same month, the Bank entered a forbearance agreement with Rome Associates which it later extended in exchange for shifting roughly $240,000 in Rome Associates' debt to Rome's personal mortgage. (*Id*.) The Bank also refinanced Rome's $600,000 home equity line of credit, further increasing his personal mortgage indebtedness to $2.475 million. (*Id*. at ¶ 54.) Even having so reduced Rome Associates' debt, by September 2004 the Bank asked Rome Associates to take its banking business elsewhere. (Id. at ¶ 44.) The next month, the Bank determined that Rome himself had "effectively exhausted his access to capital." (*Id*. at ¶ 52.) Amidst Rome's financial turmoil, certain Bank employees explicitly discussed the possibility of advising Rome's other clients, including Crawford Supply Group, about the credit downgrade of Rome Associates, as reflected in an e-mail message from Robert Dewsberry, a loan review examiner, to Bruce Lubin, the head of commercial banking at the time, dated April 1, 2004. (E-mail, Ex. 61 to App. to Feiger Family Investment Partnership's Local Rule 56.1(B)(3) Statement of Additional Facts [166].) Ultimately, they decided against it. (Def.'s Resp. to FFIP 56.1(B)(3) at ¶ 61.) Plaintiffs contend that the Bank's failure to investigate was self-interested because Rome's embezzling scheme enabled him to continue to pay down his debts to the Bank.

The Bank's motion for summary judgment against the Children's Trust focuses on eighteen checks issued between January 2004 and September 2007 from the Children's Trust to Rome which Rome then deposited into his various personal accounts. The Children's Trust was the guarantor on certain loans the Bank had made to other Feiger trusts. (Plaintiff Steven Feiger

3

Children's Trust Rule 56.1 Statement of Undisputed Facts (hereinafter "Children's Trust's 56.1") [287], at ¶¶ 1-2). Pursuant to the guarantees, some of the Children's Trust assets were held as collateral in a brokerage account managed by another institution, ABN AMRO Financial Services, Inc. ("ABN"). (*Id*.) At all relevant times, Robert Rome was a trustee and the primary administrator of the Children's Trust. (Def.'s Rule 56.1 Statement of Undisputed Facts (hereinafter "Def.'s 56.1") [241], at ¶ 12.) The eighteen Children's Trust checks at issue in this motion were issued to Rome from the ABN brokerage account, ostensibly to make tax payments on behalf of the trust (*Id*. at ¶ 25.) Steven Feiger is listed as trustee on the account, but he insists this was an error; he claims LaSalle mistakenly designated him as trustee in a form and that he inadvertently signed without noticing the mistake. (Children's Trust's 56.1 at 7-8.)

Defendant insists that ABN was, at all relevant times, an entirely separate legal entity from LaSalle, predecessor to the Bank of America, and therefore the Bank never had any relationship with the Children's Trust. (Def.'s 56.1 at ¶ 17.) Plaintiffs, on the other hand, maintain that ABN was a "subsidiary or affiliate" of LaSalle, and that LaSalle routinely "blurred any legal distinction" between its own corporate form and ABN's by failing to materially distinguish the two entities. (Plaintiff Steven Feiger Children's Trust's Mem. in Opp'n to Bank of America's Mot. for Partial Summ. J. on Count IV (hereinafter "Children's Trust's Mem. in Opp'n") [286], at 2, 3.) For example, LaSalle Vice-President Marcus Montanye served as the "Relationship Manager" for each of the Feiger trusts, including the Children's Trust, and managed the "entire banking relationship" between Plaintiffs and LaSalle. (Montanye Dep., Ex. B to Children's Trust's 56.1, 12:15-22.) Montanye admitted that he "quarterback[ed]" the transactions stemming from Plaintiffs' various trusts and entities (*id*.), and that he oversaw the issuance of the eighteen Children's Trust checks drawn on the brokerage account at ABN. (*Id*. at 66:4-6.) In his deposition, Montanye referred to the collateral, i.e., the Children's Trust funds in the brokerage account, as "held in a brokerage account at the bank" (*Id*. at 65:3-4) and "housed in trust accounts, which were with our brokerage

4

group at LaSalle." (*Id*. at 62:12-14).

Before Rome embezzled the first check from the Children's Trust in early 2004, Steven Feiger received an e-mail from Kristin Shoemaker of LaSalle, entitled "Streamlining Future Tax Payments from Trust Accounts" and dated June 4, 2003. (E-mail, Ex. C to Children's Trust's 56.1.) The signature on Shoemaker's e-mail identifies her as a loan associate for LaSalle Bank, yet the domain name on her e-mail address is "abnamro.com." (*Id*.) Montanye also received a copy of the message. (*Id*.) Shoemaker's June 4, 2003 message explained that she was sending Steven Feiger a form letter which Steven Feiger was to sign in order to "authorize LaSalle to issue checks" from the Children's Trust. (*Id*.) The form letter, pre-addressed to ABN, specifically authorized ABN to issue "checks payable to Robert Rome as trustee when collateral is released by Marcus Montanye" from the Children's Trust. (*Id*.) Thus, before each of the eighteen checks was issued, a representative from the Bank called Steven Feiger to inform him that a check had been requested and to ask for authority to issue the check. (Children's Trust's 56.1 at ¶ 7.) In each instance, Steven Feiger signed a version of the authorization letter approving the disbursement of funds on the date and for the amount requested. (Exs. D-MM to Def.'s 56.1.) As the last step in the process, Montanye authorized the release of the collateral and subsequently, the issuance of each check. (Montanye Dep. at 65-66.) Although Steven Feiger's authorization letters all requested that the check be issued to "Robert Rome as trustee" (Exs. D-MM to Def.'s 56.1), seven of the checks were issued simply to "Robert Rome." (Exs. O, S, U, Y, GG, II and KK to Def.'s 56.1.)

Of the eighteen checks issued, Rome deposited three of them, all payable to "Robert Rome as Trustee" or "Robert Rome TTEE," into his personal account at LaSalle. (Def.'s 56.1 at ¶ 30.) Rome deposited the other fifteen checks into personal accounts he held at Harris Bank and North Shore Bank & Trust. (*Id*. at ¶ 32.) The Bank asserts that all eighteen checks were paid by National Financial Services, LLC ("NFS") at the Bank of New York Delaware ("BNYD") and that neither

5

LaSalle nor its successor, Bank of America, "issued or caused to be issued" any of the eighteen checks. (*Id*. at ¶ 24.) Plaintiffs, however, state that LaSalle's delegation of custodial and check clearing services to NSF and BNYD, who were acting as agents, does not diminish the Bank's direct role in the management of the transactions. (Children's Trust's Mem. in Opp'n at 7.)

## **DISCUSSION**

The court grants summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must examine the evidence in the light most favorable to nonmoving party without making credibility determinations or weighing evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. FED. R. CIV. P. 56(c); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Defendant seeks partial summary judgment on Plaintiffs' claim of aiding and abetting a breach of fiduciary duty (Count VI). Defendant contends that Plaintiffs have produced no facts that show the Bank knowingly and substantially assisted Rome in his misconduct. Defendant also seeks summary judgment on all remaining claims brought by the Children's Trust, arguing primarily that the claims are displaced by the U.C.C. and, alternatively, that the Bank had no business relationship with the Children's Trust. For the reasons described herein, Defendant's motions are denied with respect to Count VI, but otherwise granted.

**I.     Defendant's Motion for Partial Summary Judgment on Count VI**

The court first addresses the Defendant's argument that there are no disputes of material fact concerning Plaintiffs' claim that the Bank aided and abetted Rome's breach of fiduciary duty. In its motion for partial summary judgment, Defendant cites cases that establish a three-part test

for the tort claim of aiding and abetting: a showing that "(1) the party whom the defendant aids performed a wrongful act causing an injury; (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." (Defendant's Mot. No. 4 or in the Alternative for Partial Summ. J. on Count VI (hereinafter "Mot. No. 4") [262], at ¶ 2.) (*quoting Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006)). Defendant argues that Plaintiffs have not adduced evidence showing the Bank "knowingly and substantially" assisted Rome in the breach of the fiduciary duty he owed them and therefore, the Defendant should be granted partial summary judgment as to Count VI. (*Id.*)

Yet Plaintiffs contend, and the court agrees, that the stringent test Defendant cites is not the only rubric through which this claim can be examined. Although Plaintiffs have styled Count VI as a claim for "aiding and abetting," most of the case law they cite sets forth the standard for proof of an equitable claim for knowing participation in a fiduciary's breach. (*see, e.g.,* Pls.' Resp. to Bank of America's Mot. No. 4 to "Eliminate" Count VI (hereinafter "Pls.' Resp") [304], at 5.) (quoting *Conant v. Karris*, 165 Ill. App. 3d 783, 790-91, 520 N.E.2d 757, 762 (1st Dist. 1980)) ("A third party who participates in a breach of a fiduciary's duty of loyalty, or knowingly accepts any benefits from such a breach, becomes directly liable to the aggrieved party."). Under Illinois law, "a third party who colludes with a fiduciary in committing a breach of the fiduciary's duty, and who benefits thereby, is under a duty of restitution to the beneficiary and liability may be premised upon a defendant's participation in a fiduciary's breach of trust." *Nat'l Union Fire Ins. Co. v. Wilkins-Lowe & Co.*, 29 F.3d 337, 341 (7th Cir. 1994) (internal quotation marks and citations omitted); *see also Chicago Park Dist. v. Kenroy*, 78 Ill. 2d 555, 565, 402 N.E.2d 181, 186 (1980). Proof of such an equitable claim can support an equitable remedy. Thus, the court may impose a constructive trust upon benefits received by a third party because of that party's participation in or knowledge of a breach of fiduciary duty. *People el rel. Daley v. Warren Motors, Inc.*, 114 Ill. 2d 305, 318-19, 500 N.E.2d 22, 28-29 (1986) (imposing a constructive trust on benefits received by a corporation that

7

paid reduced property taxes in return for kickbacks to members of the county board). Here, the facts that Plaintiffs allege seem more naturally matched with this claim in equity than to any similar claim in tort law. Indeed, at a recent hearing on the matter Defendant's counsel acknowledged that Plaintiffs may allege such a claim (without conceding they can prove it):

> The court: What I am not hearing you say is that – What the plaintiffs do have, although you would believe that they can't prove it, but what they do have is a claim of participation in a fiduciary breach, knowing participation in a fiduciary breach.

> Mr. Benjamin: I do say there is such a theory available to them. Yes, I do.

(Pre-Trial Conference Transcript at 21:12-18 (Oct. 12, 2011).) The court concludes that Plaintiffs' Count VI, though styled as "aiding and abetting" a breach of fiduciary duty, is more aptly characterized as an equitable claim for knowing participation in a breach of fiduciary duty.[1]

This claim appears to be at the heart of Plaintiffs' allegations. Plaintiffs assert that the Bank knew Rome was their fiduciary and that he had a history of engaging in accounting malpractice, yet willfully refrained from investigating the breadth of his misconduct in order to continue benefitting from it. (Pls.' Resp. at 6.) According to Plaintiffs, Rome was embezzling from them in order to pay down his debt to the Bank. (*Id*.) Accordingly, Plaintiffs believe that they can prove the Bank knowingly participated in Rome's breach of his fiduciary duty to them.

The elements of "participation" in such a breach are "(1) an act or omission which furthers or completes the breach of trust by the trustee and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge." *Chabraja v. Martwick*, 248 Ill. App. 3d 995, 998, 618 N.E.2d 800, 803 (1st Dist. 1993) (citing G. Bogert, Trusts &

---

[1] Plaintiffs' mischaracterization of the claim does not require entry of judgment against them. "[S]pecifying an incorrect legal theory is not a fatal error." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) (reversing dismissal of plaintiff's claims and "recharacteriz[ing]" them for her). As long as a plaintiff has alleged sufficient facts to support a claim for relief, he or she need not match those facts to the correct legal theory. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992).

TRUSTEES § 901, 258-259 (2d ed. 1982)). Defendant asserts that its "mere acceptance of deposit or payment of checks" does not constitute an act or omission that furthered Rome's fiduciary breach[2] and that Rome's deposit of fiduciary funds into a personal account does not constitute notice to the Bank of his breach. As this court has observed previously, however, *see Crawford Supply Group*, 2011 WL 3704262 at *9, *Crawford Supply Group*, 2011 WL 1131292 at *8-9, Plaintiffs have offered evidence that the Bank had knowledge of and involvement in Rome's breach that goes beyond merely accepting deposits or paying checks: Plaintiffs note that the Bank knew Rome engaged in accounting malpractice with respect to two other clients, as evidenced by the two lawsuits the Bank brought against Rome for recovery. The Bank also knew that Rome and his business were struggling financially: the Bank downgraded Rome Associates' credit rating, reorganized its debt, and ultimately asked the company to close its account. In April 2004, Bank employees expressly contemplated notifying other clients engaged in business with Rome about his company's credit downgrade but then consciously opted to remain silent on the matter. Had the Bank properly investigated Rome or notified Plaintiffs of concerns regarding his conduct, Plaintiffs argue, they would have suffered far fewer losses. For example, when, in early April 2004, the Bank officials discussed notifying other Rome clients about Rome Associates' troubles, the Bank had issued only one of the eighteen checks Rome ultimately embezzled from the Children's Trust. Plaintiffs contend, further, that the Bank's decision not to investigate other accounts over which Rome had control was a willful and self-interested course of action.

The court concludes there is a genuine issue of material fact as to (1) whether the Bank's

---

[2] Although Defendant's motion is framed by the test for aiding and abetting in tort law, it too cites case law rooted in the equitable claim for knowing participation in a fiduciary breach. For example, Defendant's statement that the acceptance of deposit or payment of checks cannot amount to participation is based on *Chabraja*, 248 Ill. App. 3d at 999, 618 N.E. 2d at 803, a taxpayer derivative suit where the plaintiff sought restitution from defendant bank for allowing school district funds to be kept in a non-interest bearing account in breach of the school board's fiduciary duty.

9

decision not to investigate Rome and not to inform Plaintiffs of his malfeasance "furthered" Rome's breach and (2) whether the Bank knew that, when it accepted the disputed deposits or paid out on the disputed checks, "the transaction amounted to a breach of trust."

Nor is Plaintiffs' equitable claim barred by the Fiduciaries Obligation Act. 760 ILCS 65/1, *et seq*. The purpose of that Act is to facilitate banking transactions and to place the onus on principals, rather than on banking institutions, to employ honest fiduciaries. *Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 622 (7th Cir. 2001). The Act protects the Bank from liability for dealing with a fiduciary that has breached his duty to the principal, as long as the Bank did not act "with actual knowledge" of the breach or with such knowledge of facts that its actions "amount[ ] to bad faith." 760 ILCS 65/9. In this court's view, a third party's knowing participation in the breach of a fiduciary duty may well constitute an act in bad faith with respect to the principal. Given the support for an inference that the Bank knew of and participated in Rome's breach–namely, knew that Rome had engaged in accounting malpractice and consciously declined to notify his other clients or investigate his other account activities–the court is unable to find that no reasonable jury could determine the Bank's conduct was in bad faith.[3]

Finally, Defendant urges that any claim for participation in a fiduciary breach is barred by the statute of limitations established by U.C.C. § 3-118. In support, the Bank cites *Cont'l Cas. Co. v. Am. Nat'l Bank and Trust Co. of Chicago*, 329 Ill. App. 3d 686, 700, 768 N.E.2d 352, 363 (1st

---

[3] Defendant filed additional authority regarding a claim for knowing participation in a fiduciary breach (Def.'s Mot. for Leave to File Additional Authority Regarding the Difference Between a Claim for Knowing Participation and a Claim for Aiding and Abetting [328]), arguing that the drafters of the Uniform Fiduciaries Act (adopted in Illinois as the FOA) intended to "abolish" the very claim Plaintiffs put forth in Count VI. (*Id*. at 2-3.) Defendant cites several pre-Uniform Fiduciaries Act cases and commentary from a 1922 Commissioners Report on the Act in support of this argument. The court notes, however, that there is no parallel, in any of the very early cases cited, to the Bank's knowledge of Rome's fraudulent conduct with respect to two different clients, its allegedly willful decision not to investigate further, and the possibility that the Bank benefitted financially from its inaction. Plaintiffs' claim for knowing participation in a fiduciary breach comprises more than mere allegations of unauthorized checks or improper endorsements.

Dist. 2002), where the Illinois Appellate court concluded that plaintiff's common-law breach of contract claim against defendant bank was not displaced by the U.C.C., but that the three-year statute of limitations established by § 4-111 of the Code nevertheless governed that claim. With respect, the court declines to impose on Plaintiffs' common-law claims a statute of limitations that governs a statutorily-created cause of action. Defendant's motion for partial summary judgment as to Count VI is denied.

II.     **Defendant's Motion for Summary Judgment against Steven Feiger Children's Trust**

Defendant also moved for summary judgment against the Children's Trust. In addition to the claim for aiding and abetting–or, more accurately, for knowing participation in a fiduciary breach–set forth in Count VI, the Children's Trust has brought claims for negligence (Count III) and breach of contract (Count IV). In earlier submissions, the Bank has argued that some, if not all, of the Plaintiffs' claims are displaced by the Uniform Commercial Code. The court has never rejected this argument outright, but rather invited Defendant to articulate which specific provisions of the Code require displacement of which claims. In this motion for summary judgment against the Children's Trust, Defendant appears to argue that all claims based on the eighteen checks drawn on the Trust are displaced by U.C.C. § 3-307(b). (Def.'s Mem. in Supp. of Summ. J. Mot. against Steven Feiger's Children's Trust (hereinafter "Def.'s Mem. in Supp.") [240], at 19-20.) The court now takes up that argument, noting that it addresses the negligence and breach of contract claims as though they are based on the individual transaction of each of the eighteen checks. To the extent the Children's Trust asserts more generalized negligence and breach of contract claims arising from the Bank's failure to investigate Rome, the court will reserve ruling on those claims pending further briefing on whether the Children's Trust is a customer of the Bank.[4]

---

[4] The court's ruling on Defendant's Motion in Limine No. 2 [260], in which the Bank moves to "eliminat[e] the claims of negligence asserted by non-customers in Count III" (*Id*. at 1), has also been deferred pending further briefing on the question of which of the Plaintiffs were
(continued...)

Section 1-103 of the Code provides that principles of law and equity supplement the Code "[u]nless displaced by the particular provisions" of the Code. U.C.C. § 1-103(b). As this court has already declared, "[t]he case law is consistent: the UCC displaces common law remedies to the extent that the facts alleged fit a provision of the UCC." *Crawford Supply Group*, 2011 WL 1131292 at *14. The Bank here insists that Chapter 3 of the UCC effects such a displacement of any claims asserted by the Children's Trust: "Section 3-302 provides that a taker [of an instrument] cannot be a holder in due course if the instrument was taken with notice of a claim under Section 3-306, and Section 3-307 sets forth circumstances under which a person taking an instrument has notice of the claim to preclude a holder in due course status." (Def.'s Mem. in Supp. at 20.) Defendant refers more specifically to § 3-307(b) later in its brief (*id*. at 22), but still does not articulate which specific provisions of § 3-307(b) "fit[ ] the facts of [this] case to a T." *Cf. Travelers Cas. & Sur. Co. of Am. v. Nw. Mutual Life Ins. Co.*, 480 F.3d 499, 505 (7th Cir. 2007).

Defendant has, of course, filed many briefs on these issues, and has put more flesh on the bones of its "displacement" argument in its motion for reconsideration of a summary judgment ruling regarding another of the Plaintiff entities. Specifically, Defendant argues for the displacement, under §3-307(b)(2), of claims based on the Bank's receipt of checks from Rome "payable to the fiduciary as such" and, under § 3-307(b)(3), of claims based on the Bank's receipt of checks from Rome "payable to the fiduciary personally."[5] (Def.'s Reply in Supp. of its Mot. for

---

[4](...continued)
customers of the Bank. If the Children's Trust, or any other of the Plaintiffs, are not customers of the Bank, the court is unaware of the source of any common law duty owed by the Bank.

[5] Section 3-307 of the Code describes situations in which a bank taking an instrument from a fiduciary will be on notice of the fiduciary's breach and therefore, fail to qualify as a holder in due course. Sections 3-307(b)(2) and (b)(3) of the Code provide:

> (b) If (i) an instrument is taken from a fiduciary for payment or collection of for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its
> (continued...)

Reconsideration, at 10.) With respect to the eighteen checks at issue here, only eleven of the checks issued from the Children's Trust were made payable to "Robert Rome as trustee," ( Exs. D-MM to Def.'s 56.1), and the remaining seven were made payable to Robert Rome personally. (Exs. O, S, U, Y, GG, II and KK to Def.'s 56.1.) Defendant's argument appears to be that common law claims based on the eleven checks issued to Rome as trustee are displaced by § 3-307(b)(2) and, likewise, common law claims based on the other seven checks, issued to Rome personally, are displaced by § 3-307(b)(3).

Section 3-307 addresses only situations where a party has "taken" an instrument "from a fiduciary for payment or collection or for value." U.C.C. § 3-307(b). Here, only three of the fifteen checks were "taken" by the Bank for deposit into one of Rome's personal accounts and, thus, only those three checks can be examined for displacement by § 3-307. Under § 3-307(b)(2), there are three scenarios in which the taker of a check is on notice as to a breach of fiduciary duty: "where the instrument is (1) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as

---

[5](...continued)
  proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

  (2) In the case of an instrument payable to the represented person or the fiduciary as such, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person.

  (3) If an instrument is issued by the represented person or the fiduciary as such, and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty.

such, . . . " U.C.C. § 3-307(b)(2). Plaintiffs have not shown that either of the first two scenarios apply, but the third does: It is undisputed that Rome deposited three Children's Trust checks, made payable to him as trustee, in a personal account at the Bank. (Def.'s 56.1 at ¶ 30.) With respect to those three checks, the U.C.C. appears to create a basis for liability. Therefore, claims derived from those three checks are indeed displaced by § 3-307(b)(2)(iii) and are subject to the three-year statute of limitations described in U.C.C. § 3-118(g). And Steven Feiger's involvement in signing a written authorization for each such check would defeat any argument that the discovery rule or fraudulent concealment doctrine lifts the timeliness bar.

Of the remaining fifteen checks, some were payable to Rome, others were payable to Rome as trustee, and all were deposited by Rome at other banks. Section 3-307 could be interpreted as defeating any claims arising from those checks, if it is read as identifying the only situations where a bank dealing with a fiduciary owes a duty to the principal. The Bank has not so argued, however; instead, Defendant's central argument is that the Children's Trust was not a customer of LaSalle Bank and therefore, the Bank owed it no contractual duty nor any duty of ordinary care. (Def.'s Mem. in Supp. at 4-7.) The relevant Children's Trust funds were held in and dispersed from a brokerage account with ABN AMRO Financial Services ("ABN"). (Children's Trust's 56.1 at ¶¶ 1-2.) Although the Bank refers to ABN at times as an "affiliate," (*see e.g.* Def.'s Reply in Supp. of Mot. for Partial Summ. J. with Respect to the Steven Feiger's Children's Trust [312], at 12-13), the Bank nevertheless insists that ABN is an entirely separate legal entity, (*see e.g.* Def.'s 56.1 at ¶ 17), and thus it did not owe and could not breach any duty to the Children's Trust.

In contrast, Plaintiffs urge that there is no bright line between LaSalle and ABN. Plaintiff observes that the trust funds were held in the brokerage account as collateral for loans issued to other Feiger trusts at LaSalle. LaSalle Vice President, Marcus Montanye, admitted to serving as the "Relationship Manager" for each of the Feiger trusts, including the Children's Trust, and to managing the "entire banking relationship" between Plaintiff and LaSalle. (Montanye Dep. at 12:15-

22.) Montanye stated, further, that he "quarterback[ed]" the transactions stemming from Plaintiffs' various trusts and entities, and that he oversaw the issuance of the eighteen Children's Trust checks. (*Id*. at 12:15-22, 66:4-6.) Despite the Bank's insistence that ABN is a separate legal entity, in Montanye's deposition, he referred to the collateral, i.e., the Children's Trust funds in the brokerage account, as "held in a brokerage account *at the bank*" and "housed in trust accounts, which were with our brokerage group at LaSalle." (*Id*. at 65:3-4; 62:12-14 (emphasis supplied)). He did not appear to distinguish between LaSalle and ABN with respect to management of the brokerage account.

Moreover, on June 4, 2003, before the regular issuance of checks to Rome from the Children's Trust commenced, Steven Feiger and Marcus Montanye received an e-mail from Kristin Shoemaker, a loan associate, entitled "Streamlining Future Tax Payments from Trust Accounts." (E-mail, Ex. C to Children's Trust's 56.1.) Shoemaker's e-mail signature identifies her as a loan associate for LaSalle Bank, yet the domain name on her e-mail address is "abnamro.com." (*Id*.) In the message, Shoemaker directed Steven Feiger to sign a form letter which would "authorize *LaSalle* to issue checks" from the Children's Trust. (*Id*.) (emphasis added)  The letter, pre-addressed to ABN, specifically authorized "checks payable to Robert Rome as trustee when collateral is released by Marcus Montanye" from the Children's Trust. (*Id*.) Thereafter, before each of the eighteen checks was issued, a representative from the Bank called Steven Feiger to inform him of the request for funds and to ask for authority to issue the check; in each case, he granted such authority in writing. (Def.'s 56.1, Exs. D-MM.) As the last step in the process, Montanye authorized the release of the collateral and subsequently, issuance each check. (Children's Trust's 56.1 at ¶ 7.) Thus, the Plaintiff asserts, the Bank oversimplifies the relationship, or alleged lack thereof, between the Children's Trust and LaSalle when it cites corporate formality and ignores the fashion in which transactions were actually carried out.

For purposes of this ruling, the court will assume there are disputes of fact concerning ABN

15

and Lasalle's status as separate legal entities and whether the Children's Trust had a customer relationship with the Bank. Plaintiffs have nevertheless not persuaded the court that the Bank breached any implied contractual duty to use ordinary care when it issued payment on the remaining fifteen checks at issue. Rome was a trustee for the Children's Trust who had authority to request checks and, periodically, did indeed request a release of funds from the brokerage account, ostensibly to pay taxes. (Def.'s 56.1 at ¶ 25.) Then, as the Plaintiffs carefully lay out in their response, the Bank would contact Steven Feiger seeking permission to grant Rome's request and, for each of the eighteen checks at issue, Steven Feiger did furnish his written authorization. (Children's Trust's Mem. in Opp'n at 2-3.) Given Steven Feiger's direct involvement in the transactions, the court concludes there is no basis for the conclusion that the Bank acted negligently, or breached an implied contractual duty of care, in the issuance of the remaining fifteen checks.

The only potentially negligent action the Children's Trust alludes to in its reply is the Bank's failure to "investigate further or put a stop to Rome's fraud." (*Id*. at 5.) As explained earlier here and in other opinions, these circumstances may be sufficient to raise a possible inference of bad faith by the Bank and thus, sufficient to preclude summary judgment in favor of the Bank on other theories. *Crawford Supply Group*, 2011 WL 3704262 at *8-9. Plaintiff's cursory recitation of these facts here, however, does not satisfy the court that the Bank violated a duty of ordinary care when it (or its affiliate ABN) issued the fifteen remaining checks. Even on the seven checks that were erroneously issued to Robert Rome in his personal capacity, rather than to Rome as trustee, the court cannot see how proper issuance of the checks would have made a difference in these circumstances. Had the Bank issued those seven checks to Rome as trustee, he would have deposited them into whichever account he wanted, as he did with the other eleven checks that were issued to him as trustee. The court concludes there is no genuine issue of fact regarding the Bank's compliance with that duty with respect to the remaining fifteen checks. Defendant's motion

for summary judgment on Plaintiff's claims for negligence (Count III) and breach of contract (Count IV) is granted.

To the extent that the Children's Trust's negligence claim was based on the Bank's failure to investigate and stop Rome's misconduct, those allegations are more aptly examined within the context of the equitable claim for knowing participation in a fiduciary breach. Defendant contends that even that claim is unavailable with resepct to the the three Children's Trust checks deposited at LaSalle. In support, Defendant cites § 9 of the Fiduciary Obligations Act which provides that, where a fiduciary deposits an instrument payable to him or her, as such, into a personal account at a bank, the bank has no duty to inquire into whether the action is a breach of fiduciary duty unless the bank has "actual knowledge" of the breach or "knowledge of such facts that its action in receiving the deposit . . . amounts to bad faith." 760 ILCS 65/9. The Bank argues, as it has in previous motions, that Plaintiff has not presented evidence of the Bank's actual knowledge or bad faith and therefore, the Count VI claims based on the three checks received at the Bank are barred by § 9. Defendant asserts that "the relevant knowledge is the knowledge of 'such facts' *that relate to* the Bank's 'action in receiving the deposit.'" (Def.'s Mem. in Supp. at 13) (emphasis added). According to the Bank, Plaintiffs can show no facts "that relate to" the receipt of the three checks that indicate bad faith on the Bank's behalf.

The Bank's interpretation of the statutory language, however, appears to misstate the law. Section 9 does not require that the Bank's knowledge "relate" to the particular transaction at hand; no variation of the word "relate" even appears in § 9. The statute specifically permits a claim against a bank that has received an instrument "with knowledge of such facts that its action in receiving the deposit . . . amounts to bad faith." 760 ILCS 65/9. That language does not, on its face, impose a requirement that the known facts derive from the immediate transaction. As this court has already explained, "bad faith can be shown 'where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order [ ] to avoid knowledge that

17

the fiduciary is acting improperly.'" *Crawford Supply Group*, 2011 WL 1131292 at *8 (quoting *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *3 (N.D. Ill. Sept. 5, 1996)). AS explained earlier, Plaintiff has presented facts that could support an inference that the Bank knew Rome was engaged in fraudulent activities, yet deliberately turned a blind eye because Rome made payments on the considerable debt he owed the Bank with the proceeds from his malfeasance. Therefore, the court cannot say that there is no genuine issue of material fact regarding the Bank's alleged bad faith.

## CONCLUSION

For the aforementioned reasons, Defendant's motion for partial summary judgment on the knowing participation in a fiduciary breach claim (Count VI) [262] is denied and Defendant's motion for summary judgment against the Children's Trust [239, 249] is granted as to the negligence (Count III) and breach of contract (Count IV) claims, but denied as to Count VI.

ENTER:

Dated: November 4, 2011

_____
REBECCA R. PALLMEYER
United States District Judge